Charles Town, Incorporated v. Commissioner.
Charles Town, Inc. v. Commissioner
Docket No. 3517-62.
United States Tax Court
T.C. Memo 1966-15; 1966 Tax Ct. Memo LEXIS 267; 25 T.C.M. (CCH) 77; T.C.M. (RIA) 66015; January 19, 1966
*267 Held, the income derived from the operation of two horse racing meets was earned by petitioner, and petitioner is subject to Federal income taxes on such income. George T. Altman and Stanley H. Wilen, for the petitioner. Stuart E. Seigel and Dennis R. Powell, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in petitioner's income tax for the period May 22, 1958, to November 30, 1958, of $258,616.93, and for the fiscal year ending November 30, 1959, of $117,367.57. Petitioner assigned error as follows: (a) The Commissioner erred by including the income of Fairmount Steel Corporation in the income of the petitioner in the following amounts: Gross
Taxable
Income
Income
Fiscal Year
Erroneously
Erroneously
Ended
Included
Included
November 30, 1958
$2,808,220.18
$497,833.02
November 30, 1959
2,056,444.34
234,466.84
Findings of Fact Some facts are stipulated and are found accordingly. Charles Town, Incorporated, hereinafter sometimes referred to as Charles Town, is a corporation incorporated on May 22, 1958, under the laws of the State of West Virginia. Charles Town filed Federal corporation income tax returns for the period May 22, *268 1958, to November 30, 1958, and for the fiscal year ended November 30, 1959, with the district director of internal revenue, Baltimore, Md.
Fairmount Steel Corporation, hereinafter sometimes referred to as Fairmount, was incorporated on July 5, 1951, under the laws of the Commonwealth of Pennsylvania. The issued and outstanding stock of Fairmount, at all times material hereto, consisted of Class A common stock, which had the exclusive voting rights, and Class B common stock. The Class A common stock was issued for $1 per share as follows: Ben Cohen
50 shares
Herman Cohen
50 shares At all times material hereto, Ben Cohen and Herman Cohen have held all the issued and outstanding Class A common stock of Fairmount. The Class B common stock was issued for $50 per share as follows: Ben Cohen (younger brother of Herman)
175 shares
Herman Cohen (older brother of Ben)
175 shares
Herman Cohen, Ben Cohen, and
Stanley H. Wilen, Trustees for
Charlotte Cohen (daughter of Ben)
now Charlotte Weinberg
100 shares
Rosalee Cohen (daughter of Ben)
100 shares
Jacob Kartman, Ben Cohen, and Rosa
L. Cohen (wife of Herman) Trus-
tees for Nathan L. Cohen, son of
Herman)
200 shares
Raymond Voyes
250 shares
In March 1953 the shares *269 of stock originally issued to Raymond Voyes were transferred to a partnership consisting of Herman Cohen and Ben Cohen. In 1957 the shares of stock originally issued to the aforementioned trustees for Charlotte Cohen were distributed by said trustees to Charlotte Cohen, individually. There were no other changes in the ownership of the Class B common stock at any time material hereto, and the foregoing represented all the issued and outstanding Class B common stock. The officers of Fairmount, from its inception and at all times material hereto, all of whom constituted its board of directors, were as follows: President
Herman Cohen
Vice President and Secretary-
Treasurer
Ben Cohen
Assistant Secretary-Treasurer
Rosa L. Cohen
Assistant Secretary-Treasurer
Zelda G. Cohen
(wife of Ben)
In addition, in 1954 and at all times material thereafter, Richard Davison (husband of Rosalee) became an assistant secretary of Fairmount, although he did not serve as a director. Housing Engineering Corporation, hereinafter sometimes referred to as Housing, was incorporated under the laws of the State of Maryland, on June 25, 1952. Its issued and outstanding capital stock, all of which was common stock, was held at *270 all times during its existence as follows: No. of
Name
Shares
Ben Cohen
100
Herman Cohen
100
Zelda G. Cohen
100
Rosa L. Cohen
100
Herman Cohen, Zelda G. Cohen, and Ja-
cob Kartman, Trustees for Charlotte
Cohen, now Charlotte Weinberg
100
Herman Cohen, Zelda G. Cohen, and Ja-
cob Kartman, Trustees for Rosalee Co-
hen, now Rosalee Davison
100
Ben Cohen, Rosa L. Cohen, and Jacob
Kartman, Trustees for Nathan L. Cohen
200
At all times during its existence, the following were the officers and also constituted the board of directors of Housing: President
Ben Cohen
Vice President
Herman Cohen
Treasurer
Ben Cohen
Secretary
Herman Cohen
Assistant Treasurer
Rosa L. Cohen
Assistant Secretary
Richard Davison
Assistant Secretary-Treasurer
Zelda G. Cohen
Housing was liquidated on April 29, 1958, and was succeeded by a partnership known as C.B. Associates, composed of the same persons who were the stockholders of Housing, retaining the same percentage interest in the partnership as they had held in the corporation. In December 1952 Herman and Ben Cohen acquired controlling interest in the Maryland Jockey Club of Baltimore City, Inc., hereinafter sometimes referred to as the Maryland Jockey Club. At or about the same time Louis Pondfield *271 (a first cousin of Herman and Ben) acquired an interest in the Maryland Jockey Club which eventually amounted to 7 1/2 percent. Since that time the Maryland Jockey Club has owned and operated the Pimlico Race Course, Baltimore, Md. Ben Cohen had at various times dating back to the 1930's been interested in acquiring the Charles Town Race Course in Charles Town, W. Va. , hereinafter sometimes referred to as the Race Course. In his discussions and negotiations in that connection Ben Cohen was always accompanied by Pondfield who brought this opportunity to his attention. Albert Boyle, the owner of the Charles Town Race Course, died in November 1957. Some time thereafter Ben and Herman Cohen, hereinafter sometimes referred to collectively as the Cohen brothers, accompanied by Pondfield, had negotiations, with regard to purchasing the Race Course, with Harry Byrer, an attorney who represented Boyle's widow, Helene W. Boyle, hereinafter sometimes referred to as Helene Boyle, and the Estate of Albert Boyle, deceased. Ben Cohen was the primary negotiator on behalf of the Cohen brothers during these negotiations. Ben Cohen carried on these negotiations on behalf of himself and Herman Cohen *272 in their individual capacities and had not determined whether the purchase, if consummated, would be effected in their individual capacities, by some existing corporation, or by a corporation to be organized for that purpose. He intended to make the decision after the deal was concluded. He never advised Byrer that he was acting on behalf of Fairmount. By letter dated February 3, 1958, from Byrer to "Messrs. Cohen Bros.," an offer was made to sell the Race Course upon specified terms and conditions. The proposal provided, in part, that the property would not be assignable to any person or corporation without the written consent of Helene Boyle except that a West Virginia corporation could be formed to which the property could be transferred. However, such a corporation was to be prohibited from assigning or transferring the property without Helene Boyle's written consent. By letter dated February 5, 1958, from Ben Cohen to Byrer, a counteroffer was made in accordance with the terms of an offer made in the previous year. By memorandum dated March 24, 1958, Herman Cohen advised Ben Cohen that further proposals which he and Pondfield had discussed that day with Byrer were under consideration. *273 On March 28, 1958, Housing paid $900,000 to Fairmount. Said payment was reflected on Fairmount's books as follows: A debit to cash in the amount of $900,000 and a credit to an account entitled "Loans Payable #1," entry dated April 3, 1958. Said payment was reflected on Housing's books as a credit to cash and as a debit to an account entitled "Accounts Receivable. " This payment was not evidenced by any notes or other debt instrument, did not bear interest, was made without security, and no date for repayment was specified. At the time these funds were advanced to Fairmount, Fairmount was insolvent. By letter dated March 31, 1958, from Byrer addressed to "Messrs. Cohen Bros.," the proposals referred to by Herman Cohen in the memorandum of March 24, 1958, were rejected. Subsequently, about the middle of May 1958, the West Virginia Racing Commission issued an ultimatum to Helene Boyle that if a summer meet of that race track was not operated, they would take her franchise away. This led to the immediate negotiations between Ben Cohen and Byrer relative to the leasing of the track by Helene Boyle to a West Virginia corporation to be formed, known as Charles Town, Incorporated. On May *274 20, 1958, a lease was executed, the first paragraph of which read as follows: THIS LEASE made and executed this 20th day of May, 1958, by and between Helene W. Boyle * * * as the Lessor, and Ben Cohen, acting for Charles Town Incorporated, a corporation to be hereinafter created under the laws of the State of West Virginia, hereinafter designated and referred to as the Lessee. [Emphasis supplied.] The Cohen brothers requested Clarence E. Martin, Jr., an attorney in Martinsburg, W. Va., to cause Charles Town to be created. Martin prepared the application for charter which was executed on May 17, 1958. Charles Town was duly incorporated under the laws of the State of West Virginia on May 22, 1958. Its certificate of incorporation provided, in part, that the principal office of the corporation would be located at 1229 Mt. Royal Avenue, Baltimore, Md., which address was the office of the Cohen brothers. The objects for which the corporation was formed were to engage in and carry on the business of operating a race track. The corporation's authorized capital stock was 1,000 shares of common stock of a par value of $10 each. However, only 100 shares were issued by certificates dated May *275 22, 1958, as follows: Certificate
No. of
No.
Issued to
Shares
1
Herman Cohen
1
2
Ben Cohen
1
3
Louis Pondfield
98
The said stock was issued for the total sum of $1,000 which was not paid until July 22, 1958. During the taxable periods here involved, no additional stock was issued to any person and the aforementioned 100 shares represented all of the issued and outstanding stock during said periods of time. The previously mentioned lease executed on May 20, 1958, between Helene Boyle and Ben Cohen, acting for Charles Town, provided in part as follows: This lease shall begin on the 22nd day of May, 1958, and unless sooner terminated as herein provided shall continue to and include the 10th day of September, 1958. As rental for said premises for the full term of this lease, said Lessee shall pay to the Lessor the sum of Two Hundred and Twenty Five Thousand Dollars. * * *
The Lessee shall be entitled to all income from the operation of the horse racing meets to be conducted on said premises and from any and all other commercial operations conducted thereon * * *. * * * and the Lessee assumes all risks to persons or property from latent or patent defects in the premises and fixtures thereon; the Lessor *276 shall not be liable to the Lessee or any other person for any loss or claim of any kind whatsoever resulting from the operation of the aforesaid premises and the use thereof by the Lessee; that the Lessee shall immediately, upon execution of this instrument secure and keep in force and effect during the continuance of this lease, proper and effective comprehensive liability insurance in the sum of $500,000.00, issued by a reputable solvent insurance company qualified and authorized to do business in the State of West Virginia. * * *
It is expressly understood and agreed between the parties hereto, that this lease is entered into, upon the express condition that the Lessee or his assignee aforesaid, shall be able to secure from, and be granted, a license by, the West Virginia Racing Commission, permitting him or his said assignee to conduct a horse race meeting on the aforesaid premises for at least 56 days during the leasehold period aforesaid, and in the event such license shall not be granted or secured as aforesaid, then this lease shall be forthwith null and void and of no effect and thereupon all rights and obligations of the parties hereto will be at an end, except that the Lessor *277 shall forthwith return to the Lessee the consideration paid to the Lessor by the Lessee as aforesaid; the Lessee agrees, however, to make prompt and diligent application for such license and use every available effort to secure the same, subject to the check for $225,000.00 being good. By check dated May 20, 1958, Fairmount paid the sum of $225,000 to Helene Boyle, which payment was reflected on Fairmount's books as a debit to an account entitled "Charles Town, Inc." and a credit to cash. A supplemental agreement dated May 22, 1958, was executed between Helene Boyle and Ben Cohen, acting for Charles Town whereby an additional rental of $25,000 was agreed upon in view of the fact that the West Virginia Racing Commission authorized racing dates at the Race Course for a period in excess of that originally contemplated by the parties. The additional $25,000 was to be paid "$15,000.00 upon the execution of this agreement and $10,000.00" on September 2, 1958. By check dated May 22, 1958, Fairmount paid the sum of $15,000 to Helene Boyle, which payment was reflected on Fairmount's books as a debit to an account entitled "Charles Town, Inc." and a credit to cash. Fairmount also paid to or *278 on behalf of Charles Town the following amounts on the dates indicated, which amounts were all reflected on Fairmount's books as debits to the account of "Charles Town, Inc." and credits to cash: May 26, 1958
$ 5,000
May 26, 1958
5,000
May 28, 1958
2,025 *
May 28, 1958
1,000
May 28, 1958
1,000
May 28, 1958
$225,000
Nov. 5, 1958
224,250 **
Nov. 5, 1958
63,250 ***
Dec. 5, 1958
200,000
Nov. 24, 1959
20,000
The foregoing advances made by Fairmount to Charles Town in the total amount of $986,525 were reflected on Charles Town's books as credits to an account entitled "Account Payable - Fairmount Steel Corp." with the exception of the payment of $20,000, which was credited to a ledger account entitled "Advances from Fairmount Steel Corp." The advances from Fairmount to Charles Town were not evidenced by any notes or other debt instruments, did not bear interest, were made without security, and no date for repayment was specified. They were not intended as loans. The said advances were made pursuant to and in accordance with the agreement hereinafter mentioned, *279 dated May 20, 1958, between Fairmount and Charles Town for the purpose of furnishing the capital necessary to run the racing meets and were used to make rental payments to Helene Boyle, for deposits of opening balances in various bank accounts, and for "bankroll," which are the funds necessary to be on hand to commence wagering operations. The officers of Charles Town, from its inception until May 15, 1961, all of whom constituted its board of directors, were as follows: President
Ben Cohen
Vice President
Louis Pondfield
Secretary-Treasurer
Herman Cohen
The bylaws of Charles Town provided that the board of directors shall have the control and management of the affairs, business, and properties of the corporation. Because of the poor condition of the grandstand and other hazardous conditions when the May 20, 1958, lease was executed, over 100 improvements were required by the insurance company as a condition of writing the policy; and the said improvements were made. Despite such improvements there was still danger of claims in excess of the insurance coverage. One of the purposes of forming Charles Town was to limit liability for possible claims for personal injuries and other liability *280 that could arise out of the operation of the meet. Its chief purpose, however, was to operate a race track. On May 20, 1958, concurrently with the execution of the lease of that date, an agreement was entered into between Fairmount and Charles Town under which Fairmount agreed to provide the funds necessary for conducting said meet and Charles Town agreed to operate said meet for the benefit of Fairmount. The agreement provided as follows: THIS AGREEMENT, Made and entered into this 20th day of May, 1958 by and between FAIRMOUNT STEEL CORPORATION, a Pennsylvania corporation (hereinafter referred to as "Fairmount") and CHARLES TOWN INCORPORATED, a corporation created under the laws of West Virginia (hereinafter referred to as "Charles Town"). STATEMENT OF FACTS Fairmount, through its officers, has for sometime been negotiating with the attorneys representing Helene W. Boyle, in her own right and as Executrix of the Estate of Albert J. Boyle, deceased, for the purchase of the Charles Town Turf Club in Charles Town, Jefferson County, West Virginia, and WHEREAS, Charles Town has leased the said Charles Town race track for the purpose of operating a racing meet for such number of days as *281 the West Virginia Racing Commission will grant a license to conduct a horse racing meet on the premises, and WHEREAS, Charles Town does not have the funds, nor the credit, with which to operate the said racing meet, and WHEREAS, Charles Town has negotiated with Fairmount for the purpose of obtaining the necessary funds for the financing of the said racing meet and WHEREAS, Fairmount has agreed to advance to Charles Town a minimum of Four Hundred Fifty Thousand Dollars ($450,000.00) for the financing of the racing meet, including the sum of Two Hundred Twenty-Five Thousand Dollars ($225,000.00) which Fairmount has already advanced for the payment of the rent due pursuant to the said lease, provided that Charles Town agree to operate the said race meet for the benefit of Fairmount and shall receive for this operation ten per cent (10%) of the net profits for its services thereunder, and if the result of the operation shall result in a loss, such loss shall be borne by Fairmount, and WHEREAS, it was understood that the operations of said race meeting shall be conducted pursuant to the terms of this Agreement. NOW THEREFORE THIS AGREEMENT WITNESSETH that in consideration of the mutual *282 covenants and conditions herein contained and other good and valuable considerations, the parties agree as follows: 1. Charles Town shall apply for a license to conduct a racing meet at the Charles Town Race Track in Charles Town, Jefferson County, West Virginia for as many days as said club shall be permitted to operate, said meeting to be conducted between the days of May 23, 1958 and September 10, 1958. 2. The said race meeting shall be operated by Charles Town, but the profits therefrom shall be for the benefit of Fairmount except that Charles Town shall receive ten per cent (10%) of the profits for its services in the operation of the said racing meet and any loss shall be borne entirely by Fairmount. 3. In consideration of Fairmount receiving ninety per cent (90%) of the profits of the said meet, Fairmount agrees to advance all monies necessary for the operation of the said meet, it being understood that Fairmount will advance a minimum of Four Hundred Fifty Thousand Dollars ($450,000.00) to finance said costs of operations of said meet. 4. No interest will be charged by Fairmount for the use of its monies, it being understood that its share of the profits shall be in lieu of *283 all interest charges of any kind. 5. Charles Town shall pay all officers for their services on behalf of both corporations, out of its share of the profits of the meet and no part thereof shall be charged to Fairmount. 6. Full and complete records of all receipts and disbursements in connection with the said meet shall be maintained by Charles Town and no expenditures, out of the ordinary course of business shall be made without the approval of Fairmount. Charles Town shall, at the request of Fairmount, make a complete accounting of all such receipts and disbursements. 7. So long as Charles Town shall be indebted to Fairmount, the officers and directors of Charles Town shall be as follows: President and Director
Ben Cohen
Vice President and Direc-
tor
Louis Pondfield
Secretary, Treasurer and
Director
Herman Cohen
8. The majority of the above officers shall make all major decisions as to the allocation of income and expenses and in the management of the race meet. 9. Federal and State taxes on income of the respective parties shall be a separate obligation to be borne by each party as to its own income. 10. Charles Town shall carry all necessary insurance to protect itself as well as Fairmount *284 from all hazards. The cost of said insurance shall be regarded as an expense of operation of the said racing meet. IN WITNESS WHEREOF, the parties have caused this Agreement to be executed the day and year first above written. This agreement was executed on behalf of Fairmount by Herman Cohen as its president, and on behalf of Charles Town by Pondfield as its vice president. At this time, Fairmount had allowable net operating loss carryovers from its taxable years ended June 30, 1955, June 30, 1956, and June 30, 1957, in the total amount of $852,105.37. The minutes of the organization meeting of the stockholders of Charles Town, dated May 22, 1958, state in part as follows: Thereupon, discussion was had relative to the lease contract between Ben Cohen, agent, and Helene W. Boyle concerning the lease by him on behalf of this corporation * * *, said lease agreement being laid before the meeting. Upon motion duly made and seconded it was unanimously, RESOLVED that the lease agreement between Helene W. Boyle and Ben Cohen, agent, acting on behalf of this corporation, dated the 20th day of May, 1958, and the supplemental agreement affixed thereto, dated the 22nd day of May, 1958, be and *285 the same are, in every respect, hereby accepted, ratified, confirmed and approved by this corporation, all acts of the said Ben Cohen, acting as aforesaid, be and the same are hereby ratified, confirmed and approved by this corporation, and that all obligations and rights thereunder, be and the same are hereby, assumed by this corporation, without recourse upon the said Ben Cohen. Thereupon, a discussion was had relative to the financing of the racing meeting provided for under the lease agreement aforesaid. Upon motion duly made and seconded, it was unanimously RESOLVED that the Directors and Officers of this corporation, enter into and execute such loans, agreements and obligations on behalf of this corporation, as necessary in order to provide for and conduct a horse race meeting on the properties leased by this corporation as aforesaid. Thereupon a proposed contract between this corporation and Fairmount Steel Corporation, having been read to the meeting, discussion was had upon the same, and thereupon on motion duly made and seconded, it was unanimously RESOLVED that this corporation enter into such contract with Fairmount Steel Corporation, that the appropriate officers of this *286 corporation, when elected, execute the same on behalf of this corporation, and a copy thereof be placed in the files of this corporation. * * * The minutes of a meeting of the board of directors of Charles Town dated May 22, 1958, authorized the Peoples Bank of Charles Town, Charles Town, W. Va., the Bank of Charles Town, Charles Town, W. Va., and the Merchants and Farmers Bank of Martinsburg, W. Va., as depositories of the corporation and resolved that "all funds belonging to the corporation be deposited in said banks." A press release contained in the files of Charles Town, located at the offices of Cohen Brothers, 1229 Mt. Royal Ave., Baltimore, Md., stated in part: Charles Town, W. Va., race track will open a 75-day meeting on Friday, June 6, under new management headed by the present officers of Pimlico Race Course in Baltimore, Maryland, it was announced at noon today. Assuming operating control of the three-quarter mile track is Charlestown, Inc., headed by Ben Cohen, President, Herman Cohen, Secretary-Treasurer, and Louis Pondfield, Vice-president. All are native Baltimore businessmen who have operated Pimlico Race Course since 1953. The new corporation will assume operating *287 control of the Charlestown track immediately under terms of a private agreement with Mrs. Albert J. Boyle, widow of the founder of the West Virginia track who died last November. On November 3, 1958, a lease hereinafter sometimes referred to as the second lease, was executed between Helene W. Boyle and Charles Town covering a lease of the Race Course for the period November 20, 1958, through February 20, 1959. This lease was in all material respects similar to the first lease except that the rental provided for was the sum of $63,250 payable on execution of the lease, plus an additional sum of $5,750 per day, multiplied by the number of racing days to be allotted by the West Virginia Racing Commission, hereinafter sometimes referred to as the Racing Commission, during the period January 1, 1959, through February 14, 1959. It was further provided, however, that in the event 2 percent of the total amount wagered at the track during the period of the lease should aggregate a sum in excess of the aggregate thereinbefore provided on a daily basis of $5,750 a day for the total number of racing days, Charles Town was to pay such excess at a specified time. The lease also required Charles *288 Town, during the period of the lease, to keep in force and effect comprehensive liability insurance in the sum of $1,000,000. Charles Town was also required to make application to the Racing Commission for a license permitting it to conduct a horse racing meeting on the leased premises beginning December 17, 1958, through February 14, 1959. This lease was not assignable without the written consent of the lessor. It was executed by Ben Cohen as president of Charles Town. The negotiations for the second lease were conducted by Byrer representing the owner, and by Ben Cohen on behalf of Charles Town. Horse racing meets were conducted at the Race Course by Charles Town during the period June 6, 1958, through September 1, 1958, hereinafter referred to as the summer meet, and during the period December 18, 1958, through February 7, 1959, hereinafter referred to as the winter meet. Charles Town's business was operating the track. When Charles Town filed with the Racing Commission its application for license to conduct the meets, it was required to file a supporting statement to the application. In the supporting statements, Charles Town represented to the Commission that Charles Town was *289 the applicant; that the name to be used in the operation was "Charles Town Incorporated;" that the race track and racing were to be conducted by a corporation; that Charles Town was that corporation; that its stockholders, officers, and directors were Ben Cohen, Pondfield, and Herman Cohen; that the Fairmount Steel Corporation had "advanced by loan, or otherwise, the capital invested in the business" in the amount of $500,000; and that Herman Cohen, Pondfield, and Ben Cohen had all been interested in the operation of a race track in Baltimore, Md., called the Maryland Jockey Club, in the capacity of president, vice president, and secretary-treasurer, respectively. Charles Town was duly licensed by the Racing Commission to conduct horse racing meets for the period June 6, 1958, through September 1, 1958, excepting June 16, 1958, through June 21, 1958, and for the period December 18, 1958, through February 7, 1959, excluding December 25, 1958. Charles Town maintained its own books of account which included a cash receipts book, a cash disbursements book, a general ledger, and a general journal. These books of account reflected the receipts, disbursements and other accounting entries *290 with respect to the operation of the two racing meets in question. The cash receipts book contained columns which provided for the classification of cash receipts as follows: Pari-mutuel commissions and surplus; program sales; admissions; parking; concessions; and other miscellaneous items. The cash disbursements book contained columns for the classification of disbursements as follows: track expenses; payrolls; repairs; publicity; programs; travel and entertainment; stationery and printing; office expense; photofinish; totalisator; film patrol; West Virginia Racing Commission; racing purses; and other miscellaneous entries. Charles Town's books were kept at the offices of the Cohen brothers under the supervision of a bookkeeper employed by them. During the period July 5, 1958, through February 10, 1959, Charles Town paid $1,741,112.47 to Fairmount. These amounts were reflected as debits to the following accounts on Charles Town's books: Rent
$ 731,500.00
Account Payable - Fairmount
Steel Corp.
1,009,612.47
Total
$1,741,112.47
Charles Town maintained bank accounts as follows: Title of
Date
Date
Name of Bank
Account
Opened
Closed
Peoples Bank of Charles Town, Charles Town, W. Va.
Regular
5/28/58
11/11/63
Peoples Bank of Charles Town, Charles Town, W. Va.
Payroll
5/28/58
6/16/59
Bank of Charles Town, Charles Town, W. Va.
Racing
5/29/58
10/31/63
Bank of Charles Town, Charles Town, W. Va.
Outs
5/29/58
10/31/63
*291 The receipts from the operation of both racing meets here concerned were deposited in the regular account of Charles Town in the Peoples Bank of Charles Town, Charles Town, W. Va., from which account all expenses and charges incident to the operation of both racing meets were paid by Charles Town. During the period May 28, 1958, through February 17, 1959, deposits in the total amount of $6,523,215.27 were made in the regular account at the Peoples Bank. During the period February 21, 1959, through November 6, 1959, additional deposits totaling $78,234.80 were made in this account. During the period May 29, 1958, through February 20, 1959, 847 checks were drawn by Charles Town on the regular account totaling $6,270,972.25. During the period February 24, 1959, through June 17, 1960, 65 additional checks were drawn on the regular account totaling $305,115.47. Signature cards for these accounts were signed by Herman Cohen, Ben Cohen, and Pondfield. The payroll account had a $5,000 balance. At the end of the regular payroll period the net payroll would be withdrawn from the regular account and deposited in the payroll account against which the payroll checks would be drawn. The racing *292 account was used to pay winning purses on races. The necessary amounts were withdrawn from the regular account and deposited in the racing account, against which the checks for this item of expense were drawn. The outs account was maintained to comply with the provision of state law requiring amounts due on uncashed winning wagering tickets to be kept in a separate account. Negotiations and correspondence with the Racing Commission concerning the summer and winter meets were transacted in the name of Charles Town by Ben Cohen as president. A comprehensive liability insurance policy was issued by the Standard Accident Insurance Company covering the period November 1, 1957, to November 1, 1960, to Cohen Brothers, et al., which was a comprehensive policy insuring property of the various Cohen enterprises including: Bodily injury, except auto. Bodily injury, auto. Property damage, auto. Automobile physical damage. The name of the insured on such policy was set forth as follows: "Herman, Ben, Rosa L. and Zelda G. Cohen, t/a Cohen Brothers and" 21 financially controlled subsidiary corporations (including Housing, Maryland Jockey Club, Fairmount, but not Charles Town). On May 20, 1958, the *293 policy was extended to cover public liability of Charles Town for hazards such as injury to the public, horse racing, and accidents to participants. This coverage was limited to a maximum amount of $1,000,000. This coverage was in effect during both the summer and winter meets. There was a substantial risk of liability in excess of this amount, due in part, to the fire hazard created by the location of the boiler room in relation to the clubhouse. Certificates of insurance were furnished to Helene Boyle's insurance company and attorney, stating, inter alia: Name of insured: Charles Town, Inc., a West Virginia corporation. Location of works: Charles Town, Jefferson Co., W. Va. Description of operations: Thoroughbred Racing and club operations. Coverage of Fairmount under this policy was limited to its operations at New Cumberland, Pa., which involved construction of a housing project. An endorsement dated June 5, 1958, attached to the comprehensive dishonesty, disappearance and destruction policy issued by the Standard Accident Insurance Company in favor of the Maryland Jockey Club provided that in consideration of an additional premium of $1,837.52, additional insurance was added *294 as follows: "Charles Town, Incorporated, Charles Town, West Virginia, owned, operated, and controlled by the owners of the Maryland Jockey Club of Baltimore City, Pimlico Race Course, Baltimore, Maryland." This endorsement was accepted as follows: /s/ Ben Cohen, Secretary
Maryland
Jockey Club of Baltimore.
/s/ Ben Cohen, President
CharlesTown,
Inc.
Charles Town secured jockeys' accident insurance covering both meets and paid the premiums thereon. The fire insurance covering the premises at the Charles Town Race Track during the time that the two racing meets here in question were conducted had been secured by the lessor, Helene Boyle. Charles Town paid a pro rata share of the fire insurance premiums for said periods to Helene Boyle. On June 2, 1958, Charles Town became a member of the Thoroughbred Racing Associations of the United States, Inc., hereinafter referred to as TRA, an organization dedicated to the promotion and maintenance of public interest and confidence in thoroughbred racing. The bylaws of TRA provide that members of TRA shall consist of thoroughbred racing associations duly organized and conducting business in any state, district, or territory of the United States or in Canada. *295 While a member of the TRA, Charles Town paid $7,283.34 and $11,750 as assessments during the periods here involved. Charles Town entered into contracts with the American Totalisator Division of Universal Controls, Inc., for totalisator services during the periods here involved. The contracts were signed by Ben Cohen, president. Charles Town received and deposited in its bank account the commissions or royalties due from the catering firm of Harry M. Stevens Company on sales of refreshments at the Race Course during the two racing meets here in question. All disbursements relative to the operation of the two horse racing meets here involved were made by Charles Town on checks bearing its name. Charles Town used stationery bearing the name, "Charles Town, Inc., Charles Town Race Course, Charles Town, West Varginia," during the periods here before the Court. Charles Town maintained a telephone in its own name at the Race Course and paid the telephone charges. Legal fees incident to organizing Charles Town, and representing Charles Town before the Racing Commission and in other incidental legal matters in connection with the operation of the horse racing meets here concerned, were paid *296 by Charles Town to Martin. Charles Town filed quarterly report of total earnings of employees with the West Virginia Workmen's Compensation Department for the second, third, and fourth quarters of 1958, and the first and second quarters of 1959, reflecting its business to be "Race Track." Charles Town filed an election agreement to participate in the Workmen's Compensation Plan of the State of West Virginia for the periods here in question. On the election form, Charles Town stated its business to be "Operation of Race Track and all operation incidental thereto." Charles Town filed an employer's initial statement with the West Virginia Department of Employment Security for the periods here in question, reporting employment of over 350 employees during a typical week for its reported business of "Thoroughbred Horse Racing." Charles Town filed annual business and occupation tax returns with the State of West Virginia for the years 1958 and 1959, reporting its business to be "Race Track." Charles Town filed domestic corporation license tax returns with the State of West Virginia for the years 1958 and 1959, stating the kind of business it was engaged in to be "operation of race track." *297 During the periods here involved, Charles Town operated under an oral agreement with the advertising agency of Kal, Ehrlich & Merrick, Washington, D.C., with respect to advertising the racing meets here in question. Monthly billings from June 1958 through February 1959 were sent to Charles Town, thereafter reverting to the Charles Town Race Course, the previous account title. Charles Town filed Form 941, employer's quarterly Federal tax return, reflecting the following total number of employees employed during each of the indicated quarters: No. of
Quarter
Employees
2d/Q/58
416
3d/Q/58
422
4th/Q/58
339
1st/Q/59
388
Charles Town issued 569 W-2 Forms to persons employed at the Charles Town Race Track during the two meets here in question. Charles Town paid total payrolls to the persons employed in the operation of the two racing meets here in question in excess of $630,000. Charles Town paid West Virginia consumers sales tax on parking fees, program sales, and additional charges collected during both of the horse racing meets here in question. Charles Town contracted, in its name, with the Baltimore & Ohio Railroad Company for the operation of special race track trains to the Race Course during *298 both of the horse racing meets here in question. In the ordinary course of business, while operating the two horse racing meets here involved during 1958 and 1959, in addition to the contracts specifically mentioned in other paragraphs, Charles Town entered into contracts, oral or otherwise, in its own name and paid from its own accounts, among others, with the following companies: Name of Company
Nature of Service
Central Printing Co.
Printing
Lincoln Maintenance Co.
Track cleaning
Confirmation Photos, Inc.
Photo finish
service
Coleman Laboratories
Saliva testing
Shepherdstown Register
Printing
American Bank Stationery Co.
Stationery
Plotkin Tire & Sales
Automotive
White Motor Co.
Automotive
Potomac Light & Power
Electricity
Peoples Water Service Co.
Water
The Kastle Co.
Uniforms
Western Union
Telegraph
Plaza Wine & Liquor
Entertainment
Charles Town filed quarterly Federal excise tax returns, Form 720, and remitted the Federal admissions taxes due with respect to both horse racing meets here concerned as follows: Quarter Ending
Amount Paid
6/30/58
$ 7,185.64
9/30/58
22,453.10
12/31/58
3,586.92
3/31/59
10,235.78
Charles Town filed Federal withholding and Federal Insurance Contributions Act (FICA) tax returns, Form 941, *299 with respect to persons it employed in the operation of both horse racing meets as follows: Quarter
FICA Taxes
Withholding
Ending
Paid
Taxes Paid
6/30/58
$ 4,518.97
$12,659.57
9/30/58
13,324.10
38,664.57
12/31/58
3,186.73
15,604.82
3/31/59
8,146.06
20,338.74
By letter dated May 28, 1959, Ben Cohen as president of Charles Town closed out the corporation's account with the State compensation commissioner. Fairmount never filed the information with the appropriate state authority to qualify to do business in West Virginia. All income and expenses with respect to both race meets were reflected on the books of Charles Town. By means of a journal entry all the income and expenses, with the exception of officers' salaries, were transferred to the books of Fairmount. By means of another journal entry, 10 percent of the net profits was allocated to Charles Town. These entries were made on June 30, 1958, covering the period of the summer meet through said date which was the end of Fairmount's fiscal year; in November 1958, covering the remainder of the summer meet; and, in the spring of 1959, covering the winter meet. Fairmount reported on its Federal income tax returns the gross receipts and all the expenses *300 in connection with the operation of the two racing meets. In addition, it claimed a deduction for commission expense representing the 10 percent of the net profits allocated to Charles Town. Fairmount's return for the taxable year ended June 30, 1959, reflected a net profit of $732,299.86 from the racing meets. By virtue of the available net operating loss carryover it paid no Federal income tax with respect thereto. On its Federal income tax returns for the taxable periods ended November 30, 1958, and November 30, 1959, Charles Town reported gross receipts in the respective amounts of $64,886.53 and $26,051.87, which amounts represented the 10 percent allocated to Charles Town and which corresponded with the deductions claimed by Fairmount for commission expense. On its Federal income tax return for the taxable period ended November 30, 1958, Charles Town claimed a deduction in the amount of $40,000 for compensation of officers as follows: Louis Pondfield
$25,000
Herman Cohen
7,500
Ben Cohen
7,500
In addition, it claimed a deduction of $1,000 for a contribution to the Herman and Ben Cohen Charitable Foundation, Inc. On its Federal income tax return for the taxable year ended November 30, *301 1959, Charles Town claimed a deduction in the amount of $20,000 for compensation paid to Pondfield. In addition, it claimed relatively small amounts for other deductions, including $200 for contributions to the Herman and Ben Cohen Charitable Foundation, Inc. The income and expenses of the two horse racing meets here concerned were reported only on the Federal income tax returns of Charles Town and Fairmount. No partnership information returns were filed with the Internal Revenue Service reflecting any of the income or expenses of the two horse racing meets here concerned. Fairmount and Charles Town never declared or paid formal dividends on the capital stock they issued. On July 29, 1959, Charles Town instituted an action in the Circuit Court of Jefferson County, West Virginia, against Helene Boyle to recover an alleged overpayment of rental due in accordance with the provisions of the second lease. As a result of said litigation, Helene Boyle, on November 6, 1959, paid to Charles Town the sum of $38,698.82, which amount was deposited by Charles Town in its regular account at the Peoples Bank, Charles Town, W. Va.
On March 26, 1959, Fairmount paid to C.B. Associates $400,000 which *302 was debited on Fairmount's books to the account entitled "Loans Payable #1." On September 29, 1959, Fairmount received from C.B. Associates $100,000, which was credited to the account entitled "Loans Payable #1." As of September 29, 1959, $600,000 of the $900,000 advance made by Housing to Fairmount was still outstanding. At this time C.B. Associates had succeeded Housing. This amount of $600,000 was repaid as follows: a $5,000 cash payment and, by applying $595,000 against the purchase price of $654,867.13 payable by C.B. Associates to Fairmount for Fairmount's interest in a partnership with Forest Hill Village, Inc., known as Forest Hill Village, which partnership interest was assigned by Fairmount to C.B. Associates on March 28, 1962. Charles Town Properties, Inc., hereinafter sometimes referred to as Properties, is a corporation incorporated on April 19, 1958, under the laws of the State of West Virginia. On April 24, 1959, Properties entered into a contract with Helene Boyle for the purchase of the Race Course. On or about May 7, 1959, Properties closed the contract for the purchase of the Charles Town Race Track and acquired said race track. On or about May 19, 1959, there were *303 issued and outstanding 10 shares of the capital stock of Properties, which 10 shares were acquired by Pondfield on the same date for a consideration of $1,000. The previous directors of Properties tendered their resignations, and Pondfield, Herman Cohen, and Ben Cohen became the directors of Properties on said date. On the same day the following officers of properties were elected: President
Ben Cohen
Vice President
Louis Pondfield
Secretary-Treasurer
Herman Cohen
On or about May 19, 1959, additional shares of the capital stock of Properties were issued upon payment of the sum of $9,000 as follows: No. of
Name
Shares
Ben Cohen
5
Carroll A. Weinberg, Charlotte Cohen
Weinberg, and Zelda G. Cohen, Trus-
tees for the Descendants of Charlotte
Cohen Weinberg
20
Richard S. Davison, Rosalee Cohen
Davison, and Zelda Cohen, Trustees
for the Descendants of Rosalee Cohen
Davison
20
Ben Cohen, Herman Cohen, and Stan-
ley H. Wilen, Trustees for the De-
scendents of Nathan L. Cohen
45 No additional capital stock of Properties has been issued since that time. Since that time and until the present, Properties has owned and operated the Charles Town Race Track and there has been no change in the ownership. On May 20, 1959, *304 the Equitable Trust Company of Baltimore, Md., loaned $2,000,000 to Properties, bearing interest at 5 percent per annum. Cohen brothers participated in the loan to the extent of $1,500,000. The note for $2,000,000 executed by Properties to the Equitable Trust Company was endorsed by Ben Cohen and Herman Cohen. These funds were used by Properties for the purchase of the Race Course. Fairmount was liquidated on June 1, 1962, and has since then been dormant. The minutes of the annual meeting of stockholders of Charles Town held on May 15, 1961, provide in part as follows: The Corporation has finished its racing season and has concluded its arrangements with Fairmount Steel Corporation according with the agreements previously entered into. Mr. Louis Pondfield stated that the two (2) shares heretofore held in the names of Herman Cohen and Ben Cohen had been returned to him in view of the completion of the arrangements with Fairmount Steel Corporation. * * *
The meeting then proceeded to the election of Directors for the ensuing year or until their successors are duly elected and qualified. Upon motion duly made, seconded, and passed, the following were elected: Louis Pondfield, John J. *305 Pondfield, Rose Pondfield Charles Town never conducted any business other than the operation of the two racing meets in question and was a dormant corporation at the time of the trial of this case. In a statement attached to the deficiency notice the respondent explained his adjustments for the period May 22, 1958, to November 30, 1958, as follows: (a) Additional income
$497,833.02
It is held that income in the amount of $2,808,220.18, included in the return of Fairmount Steel Corporation for the taxable year ended June 30, 1959, constituted additional income to you under the provisions of section 61 and section 482 of the Internal Revenue Code of 1954, resulting in additional taxable income in the amount of $497,833.02, computed as follows: Mutuel Dept. Commission
$2,389,657.03
Mutuel Dept. Breakage
220,678.86
Programs
21,837.60
Grandstand
51,984.45
Clubhouse
49,208.81
Box Seats
8,958.64
Clubhouse Complimentary
9,878.13
Concessions
43,773.12
Valet Parking
8,824.25
Miscellaneous Income
3,254.80
Federal Admission
164.49
Total Income
$2,808,220.18
Less: Total Expenses
2,308,885.46
$ 499,334.72
Less: Unknown Difference
1,501.70
Additional Income from Charles
Town Race Track
$ 497,833.02 A similar explanation was made *306 for the additional income of $234,466.84 for the fiscal year ended November 30, 1959. Ultimate Findings of Fact Charles Town was organized for the purpose of conducting the racing meets in question in its own right. Charles Town performed substantial income-producing activities. The total net income derived from the operation of the two racing meets in question was produced and earned by Charles Town. The respondent, in allocating the income reported by Fairmount from these racing meets to Charles Town, did not act unreasonably, arbitrarily, or capriciously. Said determination of the respondent was necessary in order to prevent the evasion of taxes and to clearly reflect the taxable income of Charles Town, within the meaning of section 482 of the 1954 Code. The advances to Charles Town by Fairmount constituted in substance an equity investment. Opinion The question presented is whether net income in the amounts of $497,833.02 and $234,466.84, representing 90 percent of the profits derived from the operation of two horse racing meets during the years 1958 and 1959, is taxable to Fairmount, as petitioner contends, or to Charles Town, the petitioner, as the respondent has determined. *307 We agree with the respondent that the said net income is taxable to Charles Town. The answer to the question depends upon the legal effect of the May 20, 1958, agreement between Fairmount and Charles Town, which agreement we have set out in full in our findings. Under this agreement Fairmount was to furnish the necessary capital with which to conduct the meets and Charles Town agreed to operate the meets "for the benefit of Fairmount" and to receive for this operation 10 percent of the net profits for its services. On its face, the agreement has the appearance of a pure agency. But when we look at how the racing meets were actually conducted the agency feature melts away. First, Ben Cohen, in obtaining the lease of the race track property from Helene Boyle, acted not for Fairmount but "for Charles Town Incorporated, a corporation to be hereinafter created." Nowhere in the lease was Fairmount ever mentioned. The lease was the property of Charles Town. As rental for the leased property the lease provided that "said Lessee [Charles Town, not Fairmount] shall pay to the Lessor the sum" of $225,000. The lease was made subject to the express condition that the lessee "shall be able to secure *308 from, and be granted, a license by, the West Virginia Racing Commission" permitting the lessee to conduct a horse race meeting on the leased premises. In applying for the license, Charles Town gave no indication that it was acting as agent for another. The Racing Commission granted the license to Charles Town and authorized Charles Town to hold race meetings on Charles Town's premises. Charles Town operated the property as if it was its own. It secured the leases; it secured the licenses; it hired all the employees; it collected all the receipts; it paid all the expenses; it entered into written and oral contracts in its own name for materials and services needed to conduct the meets; it filed all the necessary State and Federal reports; it joined TRA, an association of race track operators; it sued the lessor in its own name for excessive rent allegedly paid to the lessor; and in fact it did all the things necessary to earn the income in question. Charles Town's activities were not the usual activities of an agent and its business purpose was not the carrying on of the normal duties of agent but, rather, to conduct and operate the race track meets in its own right. We think the facts *309 and principles here are very much like the facts and principles involved in National Carbide Corp v. Commissioner, 336 U.S. 422. In that case the taxpayers were three wholly owned subsidiaries of another corporation, Airco. The taxpayers and Airco had entered into contracts which provided, in substance, that the subsidiaries were, employed as agents to manage and operate plants designed for the production of products assigned to it, and as agents to sell the output of the plants. Airco was to furnish working capital, executive management, and office facilities. The subsidiaries were to pay Airco all profits in excess of 6 percent on their outstanding capital stock, which in each case was nominal in amount. Title to the assets utilized by the subsidiaries was held by them, and the amounts advanced by Airco for the purchase of assets and working capital were shown on the books of the subsidiaries as accounts payable to Airco. No interest ran on these accounts. The profits turned over by the taxpayer subsidiaries to Airco were reported as income on Airco's returns. The taxpayers reported as income only the 6 percent return on capital specified in the contracts. The Commissioner determined *310 that the taxpayers were taxable on the income turned over to Airco as well as on the nominal amounts retained. The Court sustained the Commissioner's determination and rejected the taxpayers' contention that they acted merely as agents of Airco. In so holding, the Court noted that the fact that Airco furnished the funds necessary to acquire the assets held by the taxpayers did not detract from the reality of their ownership of such assets. Moreover, the Court held that it made no difference whether the funds advanced constituted capital contributions or loans - the important fact was that the taxpayers held title to the assets and regardless of the characterization of the source of the funds, it could not make the income earned by the utilization of the assets the income of Airco, the supplier of the funds. In so holding, the Supreme Court stated: We think that it can make no difference that financing of the subsidiaries was carried out by means of book indebtednesses in lieu of increased book value of the subsidiaries' stock. A corporation must derive its funds from three sources: capital contributions, loans, and profits from operations. The fact that Airco, the sole stockholder, *311 preferred to supply funds to its subsidiaries primarily by the second method, rather than either of the other two, [n15] does not make the income earned by their utilization income to Airco. We need not decide whether the funds supplied to petitioners by Airco were capital contributions rather than loans. It is sufficient to say that the very factors which, as petitioners contend, show that Airco "supplied" and "furnished" their assets also indicate that petitioners were the recipients of capital contributions rather than loans. [n16] Nor do the contracts between Airco and petitioners by which the latter agreed to pay all profits above a nominal return to the former, on that account, become "agency" contracts within the meaning of our decisions. The Tax Court felt that the fact that Airco was entitled to the profits by contract shows that the income "belonged to Airco" and should not, for that reason, be taxed to petitioners. Our decisions requiring that income be taxed to those who earn it, despite anticipatory agreements designed to prevent vesting of the income in the earners, foreclose this result. Lucas v. Earl, 1930, 281 U.S. 111
* * *
What we have said does not foreclose *312 a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. Whether the corporation operates in the name and for the account of the principal, binds the principal, by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal [n19] are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent. [n20] * * * [Footnotes omitted.] Application of the standards set forth by the Supreme Court in National Carbide to determine the existence of a true agency relationship reveals that the agency form here was a mere facade and that such a relationship did not exist as a matter of substance. The evidence clearly establishes that Charles Town, the purported agent, did not operate in the name and for the account of Fairmount, it did not bind Fairmount *313 by any of its actions, did not transmit money received to Fairmount on a regular and preestablished basis, nor was the receipt of income attributable to the employees or assets of Fairmount. Finally, and conclusively, Charles Town's business purpose was not the carrying on of the normal duties of agent. Its business purpose, as revealed in its certificate of incorporation and by the testimony of both Ben Cohen and Pondfield was to conduct horse racing meets, with no limitation that such activity be conducted in the capacity as agent for another. Significantly, its charter does not authorize it to conduct business in the capacity of an agent. There is a factual distinction between National Carbide and the instant case which we think is of no importance. In National Carbide, Airco, the alleged principal, owned all the stock of the three subsidiaries, the alleged agents. Here, Fairmount, the alleged principal, owned no stock in Charles Town, the alleged agent. Ninety-eight percent of the issued and outstanding stock of Charles Town was owned by Pondfield for which he paid $980 on July 22, 1958. This technical ownership of stock and the small capital furnished by him are, we think, of *314 little importance when compared with the control exercised, and the capital arranged for, by Ben and Herman Cohen. These two brothers controlled and dominated a group of organizations, including Housing, Fairmount and Charles Town. They caused Charles Town to be incorporated. They caused Housing to turn over to Fairmount, who was then insolvent, $900,000 so that Fairmount could furnish to Charles Town the capital necessary to conduct the two contemplated racing meets. Fairmount actually advanced to Charles Town $986,525 for that purpose. We think it is obvious that what the Cohen brothers were trying to accomplish was to arrange the operation of the racing meets in such a way that at least the greater part of the earnings from the meets would be the income of Fairmount, so that Fairmount could take advantage of the net operating loss carryovers in the total amount of $852,105.37 and thus pay no tax on the income from the meets until that sum was realized. The Cohens evidently did not want Fairmount to carry on the actual operations. They organized Charles Town for that purpose and by the agreement dated May 20, 1958, attempted to create a principal-agent relationship between Fairmount *315 and Charles Town. For reasons previously given we do not think a true agency relationship was thus created. National Carbide Corp. v. Commissioner, supra; Spicer Theatre, Inc., 44 T.C. 198, affd. 346 F. 2d 704 (C.A. 6, 1965). See also Fairmount Park Raceway, Inc. v. Commissioner, 327 F. 2d 780 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court. In that case a group of individuals formed a partnership which obtained a lease of a race track. The same individuals formed a corporation which, as indicated in the minutes of a meeting of its board of directors was "to function only as an agent" for the partnership in the operation of racing meets under a sublease from the partnership. These minutes further indicated that the corporation will serve only "as the agent of the partnership, be supplied with operating and construction funds by the partnership, and will account to the partnership for all actions taken and monies expended on its behalf." The partnership subleased the race track to the corporation, which during the years before the Court provided that 100 percent of the net profits from the operation would be paid over to the partnership as rental. Applications for *316 race meetings were filed with the state racing commission by the corporation in its name. At the end of a racing meet, the corporation paid its entire net income over to the partnership, deducted these amounts as "rent," which amounts were reflected as rents received in the partnership returns. The amounts claimed as rent by the corporation were disallowed in part by the Commissioner as being excessive. The taxpayers contended in part, that the corporation was the agent of the partnership and that a proper way to ascertain a reasonable rental for the property was to determine the amount of the corporation's earnings the partnership would allow the corporation to retain as compensation for operating the track. In rejecting the contention that the corporation was a mere agent, the U.S. Court of Appeals, Seventh Circuit, said: The Tax Court could properly reject the notion advanced that the corporation was in reality - considering the investments of the partners in the track and the corporation's use of the partners' borrowing power, and its capital of only $17,500.00 - merely an agency of the partners which was entitled not to the earnings the Commissioner determined for it, but really *317 entitled to only a fee. The "business purpose" of the corporation was operation of the track in its own right and not the normal duties of an agent. National Carbide Corp. v. Commissioner, 336 U.S. 422, 437 * * *. By the lease it appears that the partnership chose to avoid the burdens of principalship. 336 U.S. at 438, 69 S. Ct. at 734. In the instant case, we think the business purpose of Charles Town was the operation of the track in its own right and not the normal duties of an agent and that Fairmount chose to avoid the burdens of principalship. There are, of course, other considerations that require comment. For instance, the large payments made by Fairmount to Charles Town, although reflected on Charles Town's books as accounts payable, were definitely not loans and petitioner does not so contend. In fact, in paragraph 18 of its requested findings of fact, it requested us to find that "The said advances to petitioner were not made to it as a loan." The payments were not evidenced by any notes or other debt instruments, did not bear interest, were made without security, and with no date for repayment. In fact, according to the agreement between Fairmount and Charles Town, *318 if the payments were lost, "any loss shall be borne entirely by Fairmount." The Supreme Court, in National Carbide Corp. v. Commissioner, supra, said that a corporation must derive its funds from three sources, namely, (1) capital contributions, (2) loans, and (3) profits from operations. The payments here were not from class (3) and, since they were not loans, they must be regarded as capital contributions. Although the Supreme Court in National Carbine Corp. v. Commissioner, supra, said it was not necessary in that case to decide whether the funds supplied by Airco were capital contributions or loans, it said by way of obiter dictum that the facts "indicate that petitioners were the recipients of capital contributions rather than loans" and, in footnote 16, said in part: Since no interest ran on these accounts, the "loans" were identical, except in name, with contributions of capital. [citing several cases] In holding that the payments made by Fairmount to Charles Town were capital contributions, it is immaterial that Fairmount itself was not a stockholder of record in Charles Town. Motel Co. v. Commissioner, 340 F. 2d 445, (C.A. 2, 1965), affirming a Memorandum Opinion of this *319 Court; Sherwood Memorial Gardens, Inc., 42 T.C. 211, affd. 350 F. 2d 225 (C.A. 7, 1965). Petitioner makes a belated argument to the effect that it and Fairmount were joint venturers. That is not the way the contract between them was drawn. The agreement was that Charles Town was to operate the race track "for the benefit of Fairmount" except that "Charles Town shall receive ten per cent (10%) of the profits for its services." This is not the language of a joint venture. The parties did not hold themselves out of the public as joint venturers. Much that we said of the pure agency relationship can be repeated here. The fact that the parties treated the income returned by Charles Town as "commissions" is further indicative that the parties were not joint venturers. Under West Virginia case law, a joint venturer is considered to be a limited partner. Horchler v. Van Zandt, 120 W. Va. 452, 199 S.E. 65 (S. Ct. App. 1938). No partnership returns were filed. The only returns that were filed were those of Fairmount and Charles Town as separate corporations. We hold that Fairmount and Charles Town were not joint venturers. It follows from all of the foregoing that Charles Town earned the *320 income in question. The attempted shifting of this income to Fairmount may properly be corrected by the application of the provisions of section 482 of the 1954 Code. [1]
Petitioner contends that there was insufficient common control existing between Fairmount and Charles Town to sustain the applicability of section 482 to this case. In support of this position petitioner states that the agreement which provided for the Cohens' control of Charles Town, by placing both Herman and Ben on the board of directors of *321 Charles Town, also provided for the division of income between Charles Town and Fairmount, and that as section 482 applies only to transactions "between already controlled taxpayers," control required for the application of section 482 is wanting. The only authority cited in support of this position is section 1.482-1(c) [2] *322 of the regulations. A perusal of that section reveals that it sets forth the general circumstances in which the Commissioner's authority under section 482 may be exercised. Of itself, it lends no support to petitioner's position. Petitioner is in error in assuming that only by virtue of the agreement between it and Fairmount were the Cohens endowed with control of Charles Town. That was only one of several facts, previously mentioned herein, by which their actual and effective control of the corporation was acquired and exercised. The statute speaks in terms of organizations "owned or controlled directly or indirectly by the same interests." [Emphasis supplied.] Furthermore, the term "controlled" as used in section 482, "'includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise.'" L. E. Shunk Latex Products, Inc., 18 T.C. 940, 956. No serious question can arise as to the control of both Fairmount and Charles Town by the Cohen brothers. That they owned all *323 of Fairmount's voting stock alone establishes their control of that entity. Their actual control of Charles Town is made evident by the facts of record disclosing that they constituted, at all times material, the majority of the board of directors of Charles Town; that they caused its creation; were principal officers of the corporation and active in its management; that they caused the capital necessary to conduct the meets to be furnished to Charles Town; and, by the fact that as the majority of the officers of Charles Town, they were, according to the May 20, 1958 agreement, to "make all major decisions as to the allocation of income and expenses in the management of the race meet." The shifting of profits from one controlled entity to another for the purpose of utilizing a net operating loss carryover, as is the situation here, warrants the reallocation of that income under the provision of section 482. Spicer Theatre, Inc., supra. The respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
*. Reimbursed by Charles Town to Fairmount on June 10, 1958. ↩
**. Payable to the Citizens National Bank of Martinsburg, West Virginia. ↩
***. Payable to Helene Boyle.↩
1. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
2. § 1.482-1 Determination of the taxable income of a controlled taxpayer. * * *
(c) Application. Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.