Charlotte C. Weinberg Trust, Herman Cohen, Zelda G. Cohen and Jacob Kartman, Trustees, et al. [1] v. Commissioner. Weinberg Trust v. Comm'r
Docket Nos. 2577-68 - 2585-68.
United States Tax Court
T.C. Memo 1970-297; 1970 Tax Ct. Memo LEXIS 64; 29 T.C.M. (CCH) 1370; T.C.M. (RIA) 70297; October 22, 1970, Filed *64 Stanley H. Wilen and George T. Altman, 424 So. Beverly Dr., Beverly Hills, Calif., for the petitioners. Charles F.T. Carroll and William Morris, for the respondent. KERN *65 Memorandum Findings of Fact and Opinion Respondent has asserted transferee liability against each of the petitioners in these consolidated cases in the amounts set out below, plus interest as provided by law: Petitioner-Transferee
Docket Number
Amount
Charlotte C. Weinberg Trust, Herman Cohen, Zelda G. Cohen, and Jacob Kart- man, Trustees
2577-68
$112,500.00
Rosa L. Cohen
2578-68
375,984.50
C.D. Construction Corpora- tion
2579-68
253,394.40
Charlotte C. Weinberg
2580-68
25,339.44
Ben Cohen
2581-68
375,984.50
Herman Cohen
2582-68
375,984.50
Zelda G. Cohen
2583-68
375,984.50
Rosalee C. Davison
2584-68
137,839.44
Nathan L. Cohen
2585-68
275,678.88
These determinations of transferee liability represent deficiencies in income *66 taxes of a corporation, Charles Town, Incorporated (hereinafter sometimes referred to as "Charles Town") for the taxable period May 22, 1958 to November 30, 1958, and for the fiscal year ended November 30, 1959 in the amounts of $258,616.93 and $117,367.57, respectively. These deficiencies in income taxes correspond to deficiencies determined by the respondent in a statutory notice of deficiency mailed to Charles Town on June 11, 1962, wherein respondent increased Charles Town's reported net income by determining that certain income and deductions related to the conduct of two horse racing meets and reported in income tax returns of Fairmount Steel Corporation (hereinafter sometimes referred to as "Fairmount") were instead income and deductions of Charles Town under the provisions of sections 61 and 482, I.R.C. 1954. [2] These deficiencies were sustained in subsequent litigation, Charles Town Inc; T.C. Memo. 1966-15, affirmed 372 F. 2d 415 (C.A. 4, 1967), cert. denied 389 U.S. 841 (1967). Since the deficiencies *67 due from Charles Town have been established in the litigation mentioned above, at issue is whether petitioners, or any of them, are liable, and if so to what extent, as transferees of Charles Town. In his opening brief, respondent recognizes that the stipulated facts do not support the transferee liability determined in the case of Charlotte C. Weinberg, docket No. 2580-68 and therefore respondent concedes that there is no transferee liability in that case. Findings of Fact Some of the facts and exhibits have been stipulated and are incorporated herein by this reference. Petitioners Nathan L. Cohen, Rosa L. Cohen, Ben Cohen, Herman Cohen, Zelda G. Cohen and Rosalee C. Davison are individuals who resided within the State of Maryland at the time of the filing of their petitions herein. Petitioner Charlotte C. Weinberg is an individual who resided at 261 Indian Creek Road, Philadelphia, Pennsylvania, at the time of the filing of her petition herein. Petitioner The Charlotte C. Weinberg Trust is a trust located at 1229 Mount Royal Avenue, Baltimore, Maryland, at the time of the filing of the petition herein. Petitioner C.D. Construction Corporation is a corporation which had its *68 principal office at 1229 Mount Royal Avenue, Baltimore, Maryland, at the time of the filing of the petition herein. Charles Town, Incorporated was a corporation incorporated on May 22, 1958, under the laws of the State of West Virginia. Charles Town filed Federal corporation income tax returns for the taxable period May 22, 1958 to November 30, 1958, and for the fiscal year ended November 30, 1959, with the district director of internal revenue, Baltimore, Maryland. Fairmount Steel Corporation was incorporated on July 5, 1951, under the laws of the State of Pennsylvania. Fairmount filed a Federal corporation income tax return for the taxable year ended June 30, 1959 with the district director of internal revenue, Baltimore, Maryland. The issued and outstanding stock of Fairmount, at all times material hereto, consisted of Class A common stock and Class B common stock. The Class A common stock was issued for $1.00 per share as follows: Ben Cohen
50 shares
Herman Cohen
50 shares At all times material hereto, Ben Cohen and Herman Cohen have held all the issued and outstanding Class A common stock of Fairmount. The Class B common stock was issued for $50.00 *69 per share as follows: Ben Cohen (younger brother of Her- man)
175 shares
Herman Cohen (older brother of Ben)
175 shares
Herman Cohen, Ben Cohen, and Stanley Wilen, Trustees for Char- lotte Cohen (daughter of Ben) now Charlotte Weinberg
100 shares
Rosalee Cohen (daughter of Ben) now Rosalee Davison (wife of Richard Davison)
100 shares
Jacob Kartman, Ben Cohen, and Rosa L. Cohen (wife of Herman), Trust- ees for Nathan L. Cohen (son of Herman)
200 shares
Raymond Voyes
250 shares In March 1953, the shares of stock originally issued to Raymond Voyes were transferred to Cohen Brothers, a partnership, consisting of Herman Cohen and Ben Cohen. In 1957, the shares of stock originally issued to the aforementioned trustees for Charlotte Cohen were distributed by said trustees to Charlotte Cohen, individually. There were no other changes in the ownership of the Class B common stock at any time material hereto, and the foregoing represented all the issued and outstanding Class B common stock. The officers of Fairmount, from its inception and at all times material hereto, all of whom constituted the board of directors of Fairmount, were as follows: President
Herman Cohen
Vice President and Secretary-Treasurer
Ben Cohen
Assistant Secretary- Treasurer
Rosa L. Cohen
Assistant Secretary- Treasurer
Zelda G. Cohen
*70 In addition, in 1954, and at all times material thereafter, Richard Davison, the husband of Ben's daughter, Rosalee, became an Assistant Secretary of Fairmount, although he did not serve as a director. For a number of years, Ben and Herman Cohen and corporations and partnerships controlled by them or their families have engaged in numerous business enterprises. On numerous occasions funds were loaned or transferred by one of the Cohen enterprises to another. In or about December 1954, Herman and Ben Cohen acquired controlling interest in the Maryland Jockey Club of Baltimore City, Inc. At or about the same time Louis Pondfield, a nephew of Herman and Ben, acquired an interest in the Maryland Jockey Club which eventually amounted to 7 1/2%. Since that time, the Maryland Jockey Club has owned and operated the Pimlico Race Course, Baltimore, Maryland. Pondfield was general manager of the Pimlico Race Course operations. At various times dating back to the 1930's, Ben Cohen had been interested in acquiring the Charles Town Race Course in Charlestown, West Virginia (hereinafter sometimes referred to as the "Race Course"). Albert Boyle, owner of the Race Course, died in November of *71 1957. Subsequently Ben and Herman Cohen, together with Pondfield, engaged in negotiations with a representative of Boyle's widow, Harry Byrer, with regard to purchasing the Race Course. Pondfield had brought Mrs. Boyle's wish to sell the track to the Cohen's attention. After negotiations for a purchase of the Race Course failed, Ben Cohen successfully concluded negotiations with Byrer for the purpose of leasing it. A lease agreement covering the term of a single summer racing meet and bearing the date May 20, 1958, was drafted between Helene W. Boyle and "Ben Cohen, acting for Charles Town, Incorporated, a corporation to be formed under the laws of the State of West Virginia." This lease was executed by Helene W. Boyle and Ben Cohen. On November 3, 1958, a second lease was executed covering the term of a 1958-1959 winter meet. Charles Town was duly incorporated under the laws of the State of West Virginia on May 22, 1958. Its certificate of incorporation provided, in part, that the principal office of the corporation would be located at 1229 Mount Royal Avenue, Baltimore, Maryland, at which address was also located the offices of Ben and Herman Cohen. The corporate purpose *72 and powers of Charles Town as stated in the certificate of incorporation had to do with "the business of operating a race track or race course in all of its branches." The issued and outstanding stock of Charles Town consisted of 100 shares of common stock issued as follows: Issued To
No. of Shares
Herman Cohen
1
Ben Cohen
1
Louis Pondfield
98 The stock was issued for the total sum of $1,000.00 which was paid as follows: Date Paid
Payor
Amount
July 22, 1958
Herman Cohen
$ 10.00
July 22, 1958
Ben Cohen
10.00
July 22, 1958
Louis Pondfield
980.00 During the taxable periods of Charles Town here concerned, no additional stock was issued. During the same taxable years of Charles Town, the officers, all of whom constituted its board of directors were as follows: President
Ben Cohen
Vice President
Louis Pondfield
Secretary-Treasurer
Herman Cohen Ben and Herman Cohen continued to hold these offices in Charles Town during the time the contract between Fairmount and Charles Town, set out below, was in effect. The by-laws of Charles Town provided that the board of directors should have the control and management of *73 the affairs, business, and properties of the corporation. Pondfield was to manage the operation of the racing meets, but important policy questions were to be resolved by a majority vote among Ben Cohen, Herman Cohen, and Pondfield. An agreement dated May 20, 1958, was entered into between Fairmount and Charles Town which provided as follows: THIS AGREEMENT, Made and entered into this 20th day of May, 1958 by and between FAIRMOUNT STEEL CORPORATION, a Pennsylvania corporation (hereinafter referred to as "Fairmount") and CHARLES TOWN INCORPORATED, a corporation created under the laws of West Virginia (hereinafter referred to as "Charles Town"). STATEMENT OF FACTS Fairmount, through its officers, has for sometime been negotiating with the attorneys representing Helene W. Boyle, in her own right and as Executrix of the Estate of Albert J. Boyle, deceased, for the purchases of the Charles Town Turf Club in Charles Town, Jefferson County, West Virginia, and WHEREAS, Charles Town has leased the said Charles Town race track for the purpose of operating a racing meet for such number of days as the West Virginia Racing Commission will grant a license to conduct a horse racing meet *74 on the premises, and WHEREAS, Charles Town does not have the funds, nor the credit, with which to operate the said racing meet, and WHEREAS, Charles Town has negotiated with Fairmount for the purpose of obtaining the necessary funds for the financing of the said racing meet, and WHEREAS, Fairmount has agreed to advance to Charles Town a minimum of Four Hundred Fifty Thousand Dollars ($450,000.00) for the financing of the racing meet, including the sum of Two Hundred Twenty-Five Thousand Dollars ($225,000.00) which Fairmount has already advanced for the payment of the rent due pursuant to the said lease, provided that Charles Town agree to operate the said race meet for the benefit of Fairmount and shall receive for this operation ten percent (10%) of the net profits for its services thereunder, and if the result of the operation shall result in a loss, such loss shall be borne by Fairmount, and WHEREAS, it was understood that the operations of said race meeting shall be conducted pursuant to the terms of this Agreement. NOW THEREFORE THIS AGREEMENT WITNESSETH that in consideration of the mutual covenants and conditions herein contained and other good and valuable considerations, *75 the parties agree as follows: 1. Charles Town shall apply for a license to conduct a racing meet at the Charles Town Race Track in Charles Town, Jefferson County, West Virginia for as many days as said club shall be permitted to operate, said meeting to be conducted between days of May 23, 1958 and September 10, 1958. 2. The said race meeting shall be operated by Charles Town, but the profits therefrom shall be for the benefit of Fairmount except that Charles Town receive ten percent (10%) of the profits for its services in the operation of the said racing meet and any loss shall be borne entirely by Fairmount. 3. In consideration of Fairmount receiving ninety percent (90%) of the profits of the said meet, Fairmount agrees to advance all monies necessary for the operation of the said meet, it being understood that Fairmount will advance a minimum of Four Hundred Fifty Thousand Dollars ($450,000.00) to finance said costs of operations of said meet. 4. No interest will be charged by Fairmount for the use of its monies, it being understood that its share of the profits shall be in lieu of all interest charges of any kind. 5. Charles Town shall pay all officers for their *76 services on behalf of both corporations, out of its share of the profits of the meet and no part thereof shall be charged to Fairmount. 6. Full and complete records of all receipts and disbursements in connection with the said meet shall be maintained by Charles Town and no expenditures, out of the ordinary course of business shall be made without the approval of Fairmount. Charles Town shall, at the request of Fairmount, make a complete accounting of all such receipts and disbursements. 7. So long as Charles Town shall be indebted to Fairmount, the officers and directors of Charles Town shall be as follows: President and Director
Ben Cohen
Vice President and Director
Louis Pondfield
Secretary, Treasurer and Director
Herman Cohen
8. The majority of the above officers shall make all major decisions as to the allocation of income and expenses and in the management of the race meet. 9. Federal and State taxes on income of the respective parties shall be a separate obligation to be borne by each party as to its own income. 10. Charles Town shall carry all necessary insurance to protect itself as well as Fairmount from all hazards. The cost of said insurance *77 shall be regarded as an expense of operation of the said racing meet. IN WITNESS WHEREOF, the parties caused this Agreement to be executed the day and year first above written. This agreement was executed on behalf of Fairmount by Herman Cohen as its president, and on behalf of Charles Town by Louis Pondfield as its vice president. At the time this agreement was executed, Fairmount had allowable net operating loss carryovers of $852,105.37 from its taxable years ended June 30, 1955, June 30, 1956, and June 30, 1957. An identical agreement was made between Charles Town and Fairmount providing for the financing of the 1958-1959 winter meet during the term of the second lease. Horse racing meets were conducted at the Race Course by Charles Town during the period June 6, 1958, through September 1, 1958 (hereinafter referred to as the summer meet), and during the period December 18, 1958, through February 7, 1959 (hereinafter referred to as the winter meet). In connection with the two meets, Fairmount supplied the money necessary to begin the operation of the track, e.g. the payment of rents due under the two leases and the furnishing of cash sufficient to start the pari-mutuel system *78 of betting. Charles Town operated the track. In this connection it applied for and received a license from the West Virginia Racing Commission to conduct the two meets, maintained bank accounts, secured insurance, became a member of the Thoroughbred Racing Association of the United States, Inc., entered into contracts for promotional and other necessary services, dealt with a catering firm with respect to sales of refreshments at the race track, made all disbursements and paid all expenses relating to the operation of the horse racing meets on checks bearing its name, [3] paid the legal expenses for its organization, filed forms and made payments with various agencies or governmental divisions of the State of West Virginia incident to the conduct of the racing meets, filed Federal excise tax returns and Federal withholding and FICA tax returns and made payments with respect thereto, had stationery and maintained a telephone in its own name, and, after the conclusion of the two racing meets instituted an action and recovered from Helene W. Boyle an alleged overpayment of the rental due in accordance with the provisions of the second lease. The account of Fairmount's advances to and receipts *79 from Charles Town during the racing meets, as shown on the books of both, is as follows: [4]
Date First Meet
Advanced by Fairmount
Received by Fairmount
May 20, 1958
$225,000.00 ([1] *80 )
May 22, 1958
15,000.00 ([1])
May 26, 1958
5,000.00
May 26, 1958
5,000.00
May 28, 1958
2,025.00
May 28, 1958
1,000.00
May 28, 1958
1,000.00
May 28, 1958
225,000.00
June 10, 1958
$ 2,025.00
July 5, 1958
100,000.00 ([3])
July 12, 1958
140,000.00 ([3])
July 24, 1958
130,000.00
August 9, 1958
100,000.00
August 9, 1958
150,000.00
August 20, 1958
150,000.00
September 1, 1958
225,000.00
November 17, 1958
54,612.47
Second Meet
Advanced by Fairmount
Received by Fairmount
November 5, 1958
$224,250.00 ([2])
November 5, 1958
63,250.00 ([3])
December 5, 1958
200,000.00
January 6, 1959
$200,000.00
January 12, 1959
63,250.00 ([4])
February 3, 1959
178,250.00 ([4])
February 10, 1959
250,000.00 ([5])
The sums received by Fairmount shown above were generated by the operation of the racing meets. All income and expenses with respect to both race meets were reflected on the books of Charles Town. By means of a journal entry all the income and expenses, with the exception of officers' salaries, were transferred to the books of Fairmount. By means of another journal *81 entry, 10 percent of the net profits was allocated to Charles Town. Three sets of these entries were made: the first on June 30, 1958, covering the period of the summer meet through said date which was the end of Fairmount's fiscal year; the second in November 1958, covering the remainder of the summer meet; and the third in the spring of 1959, covering the winter meet. This was done purportedly pursuant to the contracts between the parties, the first of which is set out above in these findings. The receipts from the operation of both racing meets here concerned were deposited in the regular account of Charles Town in the Peoples Bank of Charles Town, Charles Town, West Virginia, from which account all expenses and charges incident to the operation of both racing meets were paid. During the period May 28, 1958, through February 17, 1959, deposits in the total amount of $6,523,215.27 were made in the regular account at the Peoples Bank. During the period February 21, 1959, through November 6, 1959, additional deposits totaling $78,234.80 were made in this account. During the period May 29, 1958, through February 20, 1959, 847 checks were drawn on the regular account totaling $6,270,972.25. *82 During the period February 24, 1959, through June 17, 1960, 65 additional checks were drawn on the regular account totaling $305,115.47. Fairmount reported on its Federal income tax returns the gross receipts and all the expenses in connection with the operation of the two racing meets. It claimed a deduction for commission expenses representing the 10 percent of the net profits allocated to Charles Town. Fairmount's return for the taxable year ended June 30, 1959, reflected a net profit of $732,299.86 from the racing meets. On its Federal income tax returns for the taxable periods ended November 30, 1958, and November 30, 1959, Charles Town reported gross receipts in the respective amounts of $64,886.53 and $26,051.87, which amounts represented the 10 percent allocated to Charles Town and which corresponded with the deductions claimed by Fairmount for commission expense. On its Federal income tax return for the taxable period ended November 30, 1958, Charles Town claimed a deduction in the amount of $40,000.00 for compensation of officers as follows: Louis Pondfield
$25,000.00
Herman Cohen
7,500.00
Ben Cohen
7,500.00 In addition, it claimed a deduction *83 of $1,000.00 for a contribution to the Herman and Ben Cohen Charitable Foundation, Inc. On its Federal income tax return for the fiscal year ended November 30, 1959, Charles Town claimed a deduction in the amount of $20,000.00 for compensation paid to Pondfield. In addition, it claimed relatively small amounts for other deductions, including $200.00 for contributions to the Herman and Ben Cohen Charitable Foundation, Inc. In the balance sheet portion of its income tax return for the fiscal year ended November 30, 1959, Charles Town, Inc., showed net assets of $20,690.92. The income and expenses of the two horse racing meets here concerned were reported only on the Federal income tax returns of Charles Town and Fairmount. No partnership information returns were filed with the Internal Revenue Service reflecting any of the income or expenses of the two horse racing meets. On April 24, 1959, a corporation named Charles Town Properties, Incorporated (hereinafter referred to as Properties) entered into a contract with Mrs. Helene W. Boyle for the purchase of the Charles Town Race Track (Charles Town, West Virginia) and subsequently purchased the track. Although Properties was formed *84 by persons other than the Cohens and Pondfield, by May 19, 1959, all of the stock of Properties was held by or on behalf of members of the Cohen family, or by Pondfield. Since that time, and until it was sold to outside interests in 1965, Properties owned and operated the Charles Town Race Track. After the completion of the two racing meets, Charles Town conducted no further business. At some time between May 16, 1960, and May 15, 1961, Pondfield acquired the two shares of Charles Town previously held by Ben and Herman Cohen. On June 11, 1962, respondent sent to Charles Town, Inc., by certified mail a statutory notice of deficiency determining a deficiency in income tax for the taxable periods May 22, 1958 to November 30, 1958, and December 1, 1958 to November 30, 1959, in the respective amounts of $258,616.93 and $117,367.57. In a statement attached to the deficiency notice issued to Charles Town, the respondent explained his adjustments for the period May 22, 1958 to November 30, 1958, as follows: (a) Additional income
$497,833.02
It is held that income in the amount of $2,808,220.18, included in the return of Fairmount Steel Corporation for the taxable year *85 ended June 30, 1959, constituted additional income to you under the provisions of Section 61 and Section 482 of the Internal Revenue Code of 1954, resulting in additional taxable income in the amount of $497,833.02, computed as follows: Mutual Dept. Commission
$2,389,657.03
Mutual Dept. Breakage
220,678.86
Programs
21,837.60
Grandstand
51,984.45
Clubhouse
49,208.81
Box Seats
8,958.64
Club House Complimentary
9,878.13
Concessions
43,773.12
Valet Parking
8,824.25
Miscellaneous Income
3,254.80
Federal Admission 164.49
Total Income
$2,808,220.18
Less: Total Expenses - 2,308,885.46
$ 499,334.72
Less: Unknown Difference 1,501.70
Additional Income from Charles Town Race Track
$ 497,833.02
*86 A similar explanation and computation (involving different amounts) was included in the notice with respect to the fiscal year ended November 30, 1959.
On September 5, 1962, Charles Town filed with this Court a petition, docket No. 3517-62, requesting a redetermination of said deficiency. After the trial of the case on June 14 and 15, 1965, this Court determined that there was a deficiency in income tax due from Charles Town for the taxable periods May 22, 1958 to November 30, 1958, and December 1, 1958 to November 30, 1959, in the respective amounts of $258,616.93 and $117,367.57; and said decision became final on October 9, 1967. [5] These deficiencies were assessed on April 29, 1966. In June of 1966, the Internal Revenue Service made attempts to collect the deficiencies against Charles Town. At that time Charles Town had no money to pay the tax. Charles Town's only business had been operating the two racing meets and after the completion of these meets it engaged in no further business. Any further attempts by the Internal Revenue Service to collect the deficiencies against Charles Town would have been futile. On April 3, 1958, prior to the racing meets described above, a corporation named Housing Engineering Corporation advanced $900,000 to Fairmount Steel Corporation. The issued and outstanding capital stock of Housing Engineering Corporation, all of which was common stock, was held at all times during its existence as follows: Name
Number of Shares
Ben Cohen
100
Herman Cohen
100
Zelda G. Cohen
100
Rosa L. Cohen
100
Herman Cohen, Zelda G. Co- hen, and Jacob Kartman, Trustees for Charlotte Co- hen, now Charlotte Wein- berg
100
Herman Cohen, Zelda G. Co- hen, and Jacob Kartman, Trustees for Rosalee Co- hen, now Rosalee Davison
100
Ben Cohen, Rosa L. Cohen, and Jacob Kartman, Trus- tees for Nathan L. Cohen
200 The advance of $900,000 from Housing Engineering Corporation to Fairmount did not bear any interest. A demand note was given *87 for this advance but it did not have any set maturity date. There was no security for this advance. On April 7, 1958, also prior to the racing meets described above, Fairmount Steel repaid a loan of $650,000 to the Maryland Jockey Club and a $145,000 loan to River Point Apartments Corporation, another enterprise owned by the Cohens. Housing Engineering Corporation was liquidated on April 29, 1958, and was succeeded by a partnership known as C.B. Associates, composed of the same persons who were the stockholders of Housing, retaining the same percentage interest in the partnership as they had held in the corporation. These partners retained their interests at all times relevant to these proceedings, except that the Rosalee Cohen Davison trust and the Nathan L. Cohen trust were terminated in 1965 and the assets of these trusts were distributed to the beneficiaries. On March 26, 1959, Housing Engineering Corporation having been liquidated, Fairmount paid $400,000 to C.B.A.ssociates, but on September 29, 1959, Fairmount received $100,000 from C.B. Associates so that, as of the latter date, $600,000 of the advances made by Housing Engineering Corporation and C.B. Associates was still *88 outstanding. On August 23, 1960, Fairmount made a $5,000 cash payment to C.B. Associates. The remaining $595,000 was paid by Fairmount to C.B. Associates by applying that amount against the purchase price of $654,867.13 payable by C.B. Associates to Fairmount for Fairmount's interest in a partnership with Forest Hill Village, Inc., which partnership interest was assigned to C.B. Associates on March 28, 1962. By March of 1962, when the interest of Forest Hills Village valued at $595,000 was assigned to C.B. Associates by Fairmount, the owners of Fairmount Steel had decided to liquidate the corporation. [6]
*89 C.D. Construction Corporation (hereinafter sometimes referred to as "C.D. Corporation") is a corporation formed under the laws of the State of Maryland. It was incorporated on or about May 1, 1962. C.D. Corporation issued two shares of stock in exchange for each share of Fairmount Steel stock to the shareholders of Fairmount Steel. However, no stock in C.D. Corporation was issued for the Class A voting stock in Fairmount Steel. After this transaction, the stock in C.D. Corporation was held as follows: Name
Number of shares
Ben Cohen
350
Herman Cohen
350
Charlotte Weinberg
200
Rosalee Davison
200
Nathan L. Cohen Trust
400
Ben and Herman Cohen, T/A Cohen Brothers, a partner- ship 500
Total
2,000 There have been no changes in the stock ownership to the present time except that that Nathan L. Cohen Trust has been terminated and Nathan L. Cohen became the owner of the stock held by the trust. On June 30, 1962, Fairmount Steel Corporation was liquidated and its net assets of a value of $253,394.40 were transferred to C.D. Construction Corporation. Thereafter, Fairmount engaged in no further business activity. Without taking into account any liability *90 for Federal income tax deficiencies due with respect to Charles Town, Inc., the balance sheets attached to Fairmount Steel's Federal income tax returns from its fiscal year ending June 30, 1958 through its fiscal year ending June 30, 1962, show either deficits or small surpluses which were at no time greater than $7,187.63. Opinion KERN, Judge: Acting under the procedures set forth in section 6901[7] respondent asserted transferee liability against each of the petitioners as transferees or transferees of transferees of Charles Town, Inc. The petitioners concede that Charles Town is liable, pursuant to prior court determination, for the total sum of $375,984.50 in income taxes for its taxable periods ending November 30, 1958 and November 30, 1959. It is clear from the record, and petitioners appear to concede this also, that Charles Town has not made and cannot make any payments on its tax liability and that all reasonable means to collect the tax from Charles Town have been exhausted. *91 Both parties recognize that in determining who is liable as a transferee applicable state law is controlling. See, e.g., Commissioner v. Stern, 357 U.S. 39 (1958). The parties appear to agree that a "transferee" under section 6901 includes one who receives property in a transaction which is fraudulent as to the creditors of the transferor under the laws of the states, here West Virginia and Maryland, in which the transfers in question took place. [8] In general terms, under the laws of both states, a fraudulent transfer occurs as to existing creditors of the transferor without regard to any actual intent to defraud when property is transferred to a transferee without consideration "deemed valuable in law" (in West Virginia) or "fair consideration" (in Maryland) being given in return, from a transferor who is insolvent or who is rendered insolvent by that transfer.
In his answer to the petitions filed by the *92 petitioners herein, respondent asserted transferee liability under five separate theories - each theory applying to some, but not all, of the petitioners named herein as transferees. These cases were consolidated for purposes of trial, briefs and opinion. In his original brief, respondent expressly abandoned one of his five theories, but continues to maintain the validity of the four remaining theories under which he asserts transferee liability as to eight of the nine petitioners in these consolidated cases. [9]
Respondent's four remaining theories can be summarized as follows: 1. Ben and Herman Cohen are liable under the laws of West Virginia as transferees of Charles Town because the advances from Fairmount to Charles Town under the agreement between the two corporations represented contributions to the capital of Charles Town by or on behalf of Ben and Herman Cohen, and because the return payments from Charles Town to Fairmount were in reality transfers to Ben and Herman Cohen which *93 rendered Charles Town insolven. [10]
2. The partners of C.B. Associates are liable under the laws of West Virginia as transferees of Charles Town because the equity advances made through Fairmount to Charles Town were in reality made by Housing Engineering Corporation and its successor, C.B. Associates which had advanced money to Fairmont and the repayment of these advances was in reality made to the partners of C.B. Associates. 3. The partners of C.B. Associates are liable under the laws of Maryland as transferees of Fairmount, which itself was a transferee of Charles Town. Fairmount became a transferee of Charles Town when it received payments under the agreement between these two corporations because it received, without consideration, payments of funds belonging to Charles Town. From these payments by Charles Town, Fairmount *94 repaid the advances made to the latter by Housing Engineering Corporation and C.B. Associates. These advances of $900,000 from Housing Engineering Corporation and $100,000 from C.B. Associates to Fairmount were contributions to Fairmount's equity capital. The repayments of these advances by Fairmount to C.B. Associates were, in effect, returns of equity capital and thus without consideration and such repayments rendered Fairmount insolvent or were part of a series of payments rendering Fairmount insolvent. 4. C.D. Contruction Corporation is liable as a transferee of Charles Town to the extent of $253,394.40 plus interest of 6 percent accruing from June 30, 1962. Fairmount was a transferee of Charles Town for the reasons set forth in respondent's third theory, supra. Thereafter Fairmount liquidated, transferring without consideration all of its assets to C.D. Construction Corporation on June 30, 1962. The petitioners raise three arguments in defense of respondent's assertion that any of them are liable as transferees, all of which challenge certain assumptions underlying all four of respondent's theories. As we understand petitioners' arguments, they can be summarized as follows: *95 1. Charles Town's liability for the deficienc2es in income tax involved herein did not arise until, at the earliest, the time when respondent sent to Charles Town a statutory notice of deficiency as to those taxes (June 11, 1962), because, although the deficiencies were determined under section 61 and section 482, these deficiencies were sustained by the Tax Court and on appeal by the Court of Appeals solely under section 482 without reference to section 61, and section 482 can be applied in a determination of taxes only by respondent. Thus petitioners contend that there was no liability for additional taxes on the part of Charles Town, the alleged transferor, until after the date of the alleged transfers, and consequently the transfer could not be considered as fraudulent under the pertinent statutes of West Virginia since the United States did not become an existing creditor of Charles Town prior to June 11, 1962. 2. Under the terms of the contracts between Charles Town and Fairmount (the first of which is set out in our Findings of Fact), the 90 percent of the profits from the racing meets which Fairmount was to receive in return for advancing all of the funds necessary for *96 the operation of the racing meets constituted the property of Fairmount when received, and consequently, there was no transfer from Charles Town to Fairmount on which transferee liability may be founded. 3. Even if this Court were to find that the 90 percent of the profits from the racing meets received by Fairmount was at one time the property of Charles Town, still under the terms of the contracts between Charles Town and Fairmount the transfers of the funds from Charles Town to Fairmount were not voluntary but were made for full consideration. We first decide the issues raised by petitioners in their arguments set forth above. Petitioner's first argument, based upon certain language in W. Va. Code Ann. sec. 40-1-3 (1966), [11] set forth in the margin below, is that Charles Town had not become subject to the tax liability determined in docket No. 3517-62 (the prior case in which Charles Town's substantive tax liability was determined) and thus no debt had been "contracted at the time" the monies were received by Fairmount from the racing meets, in 1958 and 1959. Citing certain authorities for the proposition that a taxpayer cannot require the application of section *97 482, and relying on a statement in Interstate Fire Insurance Co. v. United States, 215 F. Supp. 586 (E.D. Tenn.), affirmed per curiam 339 F. 2d 603 (C.A. 6) that "the use and application of Section 482 does not result in an enforcible tax consequence until there has been a reallocation resulting in a reassessment of taxes," (215 F. Supp. at 598), petitioners argue that under the law of West Virginia or any other state no obligation for Charles Town's tax liability involved herein could have arisen at least until the determination under section 482 by the respondent in his notice of deficiency dated June 11, 1962. *98 We think petitioners' argument is without merit. The general rule is stated in 9 Mertens, Law of Federal Income Taxation, sec. 53.37 as follows: It is well settled that a transferee is retroactively liable for the transferor's taxes in the year of the transfer and prior years, to the extent of the assets received from the transferor. This is so even though the transferor's tax liability was unknown at the time of the transfer. See also, e.g., Scott v. Commissioner, 117 F. 2d 36 (C.A. 8); Archie Swinks, 51 T.C. 13; and Estate of Harry Schneider, 29 T.C. 940 (1958). Cases have indicated that the shadow of the inchoate right of the Federal government to tax income is cast continuously upon a business producing income throughout the year (see Updike v. United States, 8 F. 2d 913 (C.A. 8, 1925)) and that this shadow may be cast upon the current income of a business even by a retroactive tax imposed by a statute enacted after the close of the taxable year ( Neill v. Phinney, 245 F. 2d 645 (C.A. 5, 1957)). Contrary to one *99 of the premises in petitioners' argument, the respondent in his determination of deficiency against Charles Town relied upon section 61 as well as section 482 and this fact was pointed out by both this Court and the Court of Appeals in the Charles Town case. Furthermore, both courts made it plain that they considered the income in question to have been earned by Charles Town and to have been the income of Charles Town when earned. In our opinion in that case (25 T.C.M. 77) we said, at p. 92: It follows from all of the foregoing that Charles Town earned the income in question. The attempted shifting of this income to Fairmount may properly be corrected by the application of the provisions of section 482 of the 1954 Code. In affirming us the Court of Appeals in 372 F. 2d 415 said, at p. 422: In view of our conclusion that the Tax Court was not clearly erroneous in finding that Charles Town itself earned the income from the two racing meets, the Commissioner's allocation of the total net income to Charles Town plainly is not unreasonable or arbitrary. Anticipatory agreements designed to prevent the vesting of income in the owners, which was determined *100 to be the essential nature of the intercorporate agreements in the instant case, will be disregarded and the tax assessed against the entity earning the income. It is clear that both this Court and the Court of Appeals considered that the income in question belonged to Charles Town as it was earned and was taxable to it as earned under section 61, and that any attempt to shift this income to Fairmount by an anticipatory agreement designed to prevent the vesting of this income in the owner of the income (Charles Town) could be corrected by the application of section 482. Thus Charles Town became liable in an unknown amount for taxes on income earned by it at the time it was earned and thus had a debt which had been contracted at the time the transfers were made. This liability did not originate from and was not created by allocation under section 482. This section was availed of to prevent the shifting of this income (and the tax liability thereon) by an anticipatory agreement. As we have indicated, petitioners' principal reliance in connection with this line of argument is on the statement quoted from Interstate Fire Insurance Co. v. United States, supra. *101 That case did not involve any question having to do with transferee liability and obviously was not intended by the Court to state the law in this area. In any event it is not controlling in the instant earned by the transferor and the inchoate liability for taxes thereon arose prior to the transfers. We are also unable to agree with petitioners' second argument, that the 90 percent of the profits from the racing meets "belonged" to Fairmount and never were the property of Charles Town. Without entering into a lengthy discussion on the collateral estoppel issues raised by the parties, and without again restating the numerous activities undertaken by Charles Town in conducting and operating the racing meets which are stated in our Findings of Fact, we think it is sufficient to state the ultimate conclusions which we draw from those facts: that Charles Town itself earned all of the profits generated from its operation of the two racing meets and that these profits, at least temporarily, "belonged" to Charles Town. Charles Town, Inc., supra; National Carbide Corp. v. Commissioner, 336 U.S. 422. Contrary to petitioners' third argument, in our view the transfer of funds *102 generated by the racing meets from Charles Town to Fairmount under the contract between them was not made as petitioners urge, in return for a "consideration deemed valuable in law" under the law of West Virginia. In support of their argument, petitioners do not directly urge that the advances from Fairmount to Charles Town created a debt obligation (presumably in the nature of an income bond). Instead petitioners rely on the terms of the contract between Charles Town and Fairmount which state that Ben and Herman Cohen were named officers of Charles Town, and the signature of at least one of them was required for checks on Charles Town's regular account. From these facts, petitioners argue that Fairmount's money was provided for specific uses and purposes under specified protections and for specified consideration (90 percent of the profits of the racing meets). As a consequence, petitioners conclude, the payments from Charles Town to Fairmount were not "voluntary" under applicable West Virginia law, footnote 8, supra, and were not merely a return on capital. We disagree. As this Court has previously pointed out in the Charles Town, Inc. case, the advances from Fairmount were not *103 evidenced by any notes or other debt instruments, were made without security, were made without agreement as to a repayment date, and were not repayable at all to the extent that losses were incurred in the racing meets. The portions of the contract between Charles Town and Fairmount relied upon by petitioners do no more than suggest that Fairmount intended to retain some control as to how its advances were spent; they are not helpful in ascertaining the character of these advances. These advances, made with the intention that Fairmount was to take the risk of loss attendant upon Charles Town's operation of the racing meets here in question, were contributions to capital. See Motel Corporation, 54 T.C. 1433 (filed June 29, 1970) and cases cited therein; Charles Town, Inc., supra. Hence we decide that during 1958 and 1959 Charles Town made transfers of its funds to Fairmount and did not receive in return consideration "deemed valuable in law" at a time when Charles Town had become liable for federal taxes arising from its operation of the racing meets from which Charles Town's funds were generated. *104 In determining whether a transferor was insolvent at the time transfers were made, the transferor's liability for federal income taxes, even if unknown at the time of the transfers, must be taken into account. See 9 Mertens, Law of Federal Income Taxation, sec. 53.32, and cases cited at footnote 86 therein. Applying this rule to the facts herein, it is clear that the transfers made by Charles Town to Fairmount during 1958 and 1959 rendered Charles Town insolvent. Accordingly we conclude that Fairmount was a transferee of Charles Town within the contemplation of section 6901 of the Internal Revenue Code of 1954. However our inquiry cannot end here. Fairmount has been liquidated and is not a petitioner in these proceedings. Having focused our attention on petitioners' arguments denying transferee liability as to any of the petitioners herein, we now focus our attention on the four theories of transferee liability put forth by respondent in these cases as justification for the determinations against the several petitioners therein. Relying on certain testimony by Ben Cohen in the Charles Town, Inc. case to the effect that Fairmount was viewed as *105 a holder of his personal funds and those of his brother, respondent asserts in support of his first theory, that "Ben and Herman Cohen were the true equity investors in Charles Town." "Since Ben and Herman Cohen [rather than Fairmount] were the true equity investors in Charles Town," respondent concludes, "they must also be considered the recipients of the repayments [made by Charles Town to Fairmount] which sprang from that investment" and therefore transferees under the reasoning of Powers Photo Engraving Co., 17 T.C. 393. [12]
Respondent does not directly urge that we "pierce the corporate veil" of either Charles Town or Fairmount or set aside the formal structure of any or all of the Cohen controlled entities, and has *106 called to our attention no authority which would support such a use of judicial weaponry in resolving the issue before us. He merely cites one case by way of comparison ( Griffith v. Helvering, 308 U.S. 355, 358) which has no factual analogy to the instant cases but contains a statement to the effect that taxation is concerned with the actual command over the property to be taxed. We are not persuaded that this justifies us to disregard Fairmount, Housing Engineering, C. B. Associates and C.D. Corporation (and perhaps a number of trusts) and to reach a conclusion that Ben and Herman advanced their money to Charles Town which was later repaid to them. Under both respondent's second and third theories, respondent alleges that the partners of C.B. Associates are liable as transferees, or as transferees of a transferee of Charles Town. The business engaged in by the C. B. Associates partnership was formerly carried on by Housing Engineering Corporation until, on April 29, 1958, Housing Engineering was liquidated and its business was transferred to Housing Engineering's shareholders to be carried on by the partnership formed by them under the name C. B. Associates. On April 3, 1958, prior *107 to the racing meets and during a period in which Fairmount's balance sheets showed substantial net operating losses Housing Engineering advanced $900,000 to Fairmount. A demand note without any maturity date was given for the advance; also the advance was not secured nor did it bear any interest. On April 7, 1958, also prior to the racing meets, Fairmount repaid sums of $650,000 and $145,000 which it had received as loans from other Cohen enterprises. Thereafter Fairmount advanced to Charles Town the amounts necessary for the operations of the racing meets pursuant to the contracts between them, and Fairmount was reimbursed in accordance with those contracts. Subsequent to the racing meets, Fairmount made certain repayments and received an additional advance from C. B. Associates, as successor to Housing Engineering. Repayment of the then-out-standing balance of the advances from Housing Engineering and C. B. Associates ($595,000) was made on March 29, 1962. On June 30, 1962, Fairmount was liquidated, and its assets were transferred to C.D. Corporation (an entity entirely separate from C. B. Associates), a corporation formed on May 1, 1962, whose shares were owned for all practical *108 purposes by the same persons and in the same proportions as were the shares of Fairmount. Under respondent's second theory we are asked to view the payments from Charles Town to Fairmount under their contract as payments to the partners of C. B. Associates since "[if] it were not for [the $900,000] advance, Fairmount could not have advanced the sums it did to Charles Town and continued to meet the needs of its other activities." While large sums of money had been advanced to Fairmount by Housing Engineering Corporation, this money had been mingled with other funds of Fairmount; Fairmount sometime later made the advances to Charles Town pursuant to a contract executed by these two corporations; pursuant to this contract payments in excess of the sums advanced were made by Charles Town to Fairmount over a period extending from June 10, 1958, to February 10, 1959, which were mingled with Fairmount's corporate funds; and beginning in March 1959 (after the liquidation of Housing Engineering Corporation) Fairmount made payments to C. B. Associates (successor to Housing Engineering Corporation) on account of its indebtedness to Housing Engineering Corporation and also on account *109 of an advance made to it by C. B. Associates long after the payments by Charles Town to Fairmount, these payments by Fairmount to C. B. Associates being made by cash in the amount of $400,000 on March 26, 1959, by cash in the amount of $5,000 on August 23, 1960, and by the transfer of an interest in a partnership valued at $654,867.13 on March 28, 1962. Under respondent's third theory we are asked to consider the advances made by Housing Engineering Corporation (and later by C. B. Associates) to Fairmount as contributions to the latter's capital and therefore equity investments, so if Fairmount is considered as a transferee of Charles Town, C. B. Associates should be considered transferee of a transferee since the payments made to C. B. Associates by Fairmount were not payments of debts and thus "upon consideration deemed valuable in law" and the payments rendered it impossible for Fairmount to pay Charles Town's taxes. In our opinion respondent's second and third theories must both be rejected for the reason that respondent, on whom rests the burden of proof, has failed to prove that the advances to Fairmount by Housing Engineering Corporation and C. B. Associates were not loans *110 to Fairmount as they purported to be. Consequently, we cannot accept the proposition that they were contributions of capital by Housing Engineering and C. B. Associates to Charles Town if not to Charles Town, were contributions to Fairmount. If they are to be considered, as we think they must be considered, as loans any repayments on account thereof must be considered as "upon consideration deemed valuable in law" (under West Virginia law) or for "fair consideration" (under Maryland law). Therefore we must conclude that the partners of C. B. Associates are not liable as transferees, or transferees of a transferee for the income tax liabilities of Charles Town. Finally we turn to respondent's fourth theory, that C.D. Corporation was a transferee of a transferee of Charles Town, in that Fairmount was a transferee of Charles Town and C.D. Corporation was a transferee of Fairmount to the extent of the assets transferred by Fairmount to C.D. Corporation when Fairmount was liquidated on June 30, 1962. This theory is sound. Petitioners appear to concede that Fairmount has not made and cannot make any payment on its previously established transferee liability from Charles Town, and all reasonable *111 means to collect the liability from Fairmount have been exhausted. We are convinced that the transaction in which Fairmount transferred all its assets to C.D. Corporation was a fraudulent conveyance under Maryland law, see Acme Card System Co. v. Remington Rand Business Service Inc., 21 F. Supp. 742-747 (D. Md.), and that C.D. Corporation is liable for the income tax liabilities of Charles Town to the extent of the assets received by it as a transferee of a transferee of Charles Town. The parties have stipulated that the net value of the assets transferred by Fairmount to C.D. Corporation was $253,394.40. The income tax liabilities of Charles Town were in excess of that sum. More specifically we hold that C.D. Corporation became liable for Charles Town's Federal income tax deficiencies to the extent of $253,394.40 on June 30, 1962, plus interest thereon as provided by law. Archie A. Swinks, supra. In accordance with the conclusions we have reached herein, Decisions will be entered for the petitioners in docket Nos. 2577-68, 2578-68 and 2580-68 through 2585-68. Decision will be entered for respondent in docket No. 2579-68. Footnotes
1. Cases of the following petitioners are consolidated herewith: Rosa L. Cohen, docket No. 2578-68; C.D. Construction Corporation, docket No. 2579-68; Charlotte C. Weinberg, docket No. 2580-68; Ben Cohen, docket No. 2581-68; Herman Cohen, docket No. 2582-68; Zelda G. Cohen, docket No. 2583-68; Rosalee C. Davison, docket No. 2584-68; and Nathan L. Cohen, docket No. 2585-68.↩
2. Hereafter all statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
3. Fairmount made two payments by check to Helene W. Boyle under the first lease - the first prior to the incorporation of Charles Town, and the second on the day that Charles Town was incorporated, and one payment to Helene under the second lease. It also made a payment of rent under the second lease to Citizens National Bank of Martinsburg, West Virginia. ↩
4. An additional amount of $30,000 was received by Fairmount on December 1, 1959, in respect to the second meet, which was credited on Charles Town's books to "Advance from Fairmount Steel Corp." Another amount of $20,466.84 was shown on the cash receipt book of Fairmount as received on June 12, 1959, and credited to an account entitled "Charles Town, Inc.", although it is not shown as a cash disbursement on the latter's books.↩
1. Paid directly to Helene Boyle. See footnote 3. 3. Payable to Helene Boyle. ↩
2. Paid to Citizens National Bank of Martinsburg, West Virginia as rent under second Lease. ↩
4. Debited to Rent on Charles Town's books, the other receipts after July 12, 1958, except the last being debited on Charles Town's books to "Accounts Payable, Fairmount Steel Corp." ↩
5. Debited to rent originally, but on April 30, 1959, $204,000.00 was transferred to an account entitled advance from Fairmount Steel Corporation. ↩
5. The decision was reported in a Memorandum Opinion of this Court, T.C. Memo. 1966-15, and was affirmed by the Court of Appeals for the Fourth Circuit, 372 F. 2d 415 (1967). The Supreme Court denied a writ of certiorari from the decision of the Court of Appeals, 389 U.S. 841↩ (1967).
6. Fairmount's accountant and bookkeeper, Benjamin Brilliant, testified as follows under direct examination by respondent's counsel: Q. * * * Now, in dealing with the books of Fairmount Steel, did you ordinarily prepare monthly statements? A. No, sir. Q. Did you prepare monthly trial balances ordinarily? A. No, sir. Q. Did there come a time when you did prepare trial balances on a monthly basis? A. The only time - I prepared several trial balances or statements when the Fairmount Steel had decided to close its records which was in 1962 and nothing before then. Q. About when would that have been? A. Somewhere between March and June of 1962. Q. Would you have prepared one for… March, 1962? A. Yes, I did. Q. And why did you prepare those statements again? A. To close out the records. Q. Why did you close out the records at that time? A. I was asked to do so. Q. Did you make any other - was there any other activities with respect to the records of Fairmount Steel after June of 1962? A. I think it was liquidated then and that is the end of it as far as I know.↩
7. SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection. - The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, Estate, and Gift Taxes. - (A) Transferees. - The liability, at law or in equity, of a transferee of property - * * * in respect of the tax imposed by subtitle A or B. (b) Liability. - Any liability referred to in subsection (a) may be either as to the amount of tax shown on a return or as to any deficiency or underpayment of any tax.↩
8. W. Va. Code Ann. secs. 4-1-2 and 40-1-3 (1966); Tetrick v. McIntyre, 110 W. Va. 529, 158 S.E. 788↩; Md. Ann. Code art. 39B, secs. 1, 3 and 4 (1965).
9. We stated previously as a result of abandoning one of his theories, respondent concedes that there is no transferee liability in the case of Charlotte Weinberg, docket No. 2580-68.↩
10. In his answers and on opening statement, respondent included Zelda G. Cohen and Rosa L. Cohen, the wives of Ben and Herman Cohen, respectively, as transferees under this theory "to cover the possibility that the investments might be considered to have been made jointly with their wives." On brief respondent appears to have abandoned this contention.↩
11. Section 40-1-3 provides: Every transfer or charge which is not upon consideration deemed valuable in law shall be void as to creditors whose debts shall have been contracted at the time it was made; but shall not, upon that account merely, be void as to creditors whose debts shall have been contracted, or as to purchasers who shall have purchased, after it was made; and though it be decreed to be void as to a prior creditor because voluntary, it shall not for that cause be decreed to be void as to subsequent creditors or purchasers.↩
12. This case was affirmed as to the matter respondent considers relevant to these proceedings and reversed on another matter, 197 F. 2d 704↩ (C.A. 2). In this case, the taxpayer was found to be a transferee of its wholly-owned subsidiary when that subsidiary transferred to it the bulk of its assets in payment of a supposed unsecured indebtedness resulting from advances that the taxpayer had previously made to the subsidiary.